REAVIS et al. v. REAVIS et al.

(Circuit Court, N. D. California. August 21, 1900.)

No. 12,158.

1. EQUITY—LACHES.

A delay of eight years by heirs residing in Missouri before taking steps for the appointment of an administrator, and to secure their share of the estate of a relative who died in California, does not constitute such laches as to debar them from maintaining a suit in equity to recover property of the estate alleged to have been fraudulently secured from the decedent

·· while insane, where they had no knowledge of the facts, and relied on a relative, who was also an heir, and resided where the property was situated, to look after the same and their interests, and where he had sent them sums of money from time to time as coming from the estate.

2. MORTGAGES—ABSOLUTE DEED AS SECURITY—EVIDENCE OF INTENTION OF PARTIES.

Where a conveyance of property as security, absolute in form, but not conveying the legal title, is made by statute a mortgage only, *held*, that whether a deed should be declared a mortgage depends upon the intention of the parties, and is a question of fact, in the determination of which evidence as to the existence of an indebtedness between the parties, and their subsequent transactions and conduct with reference to the property, is entitled to great, if not controlling, weight.

In Equity. On final hearing. For former opinion, see 98 Fed. 145, and 101 Fed. 19.

A. E. Bolton and Goodwin & Goodwin, for complainants.

Freeman & Bates and McKune & George, for respondent Clarke.

MORROW, Circuit Judge. This is an action in equity brought by complainants, as heirs at law of Andrew Reavis, deceased, against the respondents, to declare a trust in favor of the complainants in certain property, and for an accounting. The property which is the subject of litigation is known as the "Dixie Valley Ranch," and is situated in Lassen county, Cal. It comprises primarily a tract of swamp land of 2,320 acres, and a tract of 160 acres of agricultural land in township 35 N., range 8 E., Mt. Diablo base and meridian. The bill, however, describes by sectional subdivisions additional tracts of land in this township, aggregating 960 acres, and also other tracts by sectional subdivisions, scattered over five other townships, aggregating 1,220 acres, making the total area of the various tracts of land described in the bill 4,500 acres. The Dixie Valley ranch is estimated by complainants to be worth $30,000, together with cattle, farming implements, and personal property, valued by complainants at $50,000. The complainants are heirs at law of Andrew Reavis, and claim four-fifths of this property, as such heirs. The property now is, and ever since April 27, 1892, has been, in the possession and use of one Crawford W. Clarke, one of the respondents. The other respondents are D. M. Reavis, the brother of Andrew Reavis, his wife, Ann E. Reavis, and his son, James J. Reavis. The circumstances connected with the cause of action are as follows:

On November 3, 1873, Andrew Reavis, a resident of Lassen county, in this state, executed two deeds, whereby he conveyed certain real estate situated in that county to his brother D. M. Reavis, of Butte county, in this state. One of these deeds described the following land: The S. $\frac{1}{2}$ of the N. E. $\frac{1}{4}$ and the N. E. $\frac{1}{4}$ of the N. E. $\frac{1}{4}$ of section 20, and the N. W. $\frac{1}{4}$ of the N. W. $\frac{1}{4}$ of section 21, in township 35 N., of range 8 E., Mt. Diablo meridian, containing 160 acres, more or less, according to government surveys. The land described in this deed appears to be what was known as "agricultural land." The other deed described the following land: The S. W. $\frac{1}{4}$ and S. $\frac{1}{2}$ of N. W. $\frac{1}{4}$ and S. E. $\frac{1}{4}$ of section 20, the S. $\frac{1}{2}$ and S. $\frac{1}{2}$ of N. $\frac{1}{2}$ of section 21, the W. $\frac{1}{2}$ and the S. E. $\frac{1}{4}$ and S. $\frac{1}{2}$ of N. E. $\frac{1}{4}$ of section 22, the S. $\frac{1}{2}$ and S. $\frac{1}{2}$ of N. $\frac{1}{2}$ of section 23, the W.

$\frac{1}{2}$ of S. W. $\frac{1}{4}$ and S. W. $\frac{1}{4}$ of N. W. $\frac{1}{4}$ of section 24, the N. $\frac{1}{2}$ of N. E. $\frac{1}{4}$ and N. E. $\frac{1}{4}$ of N. W. $\frac{1}{4}$ of section 26, the N. W. $\frac{1}{4}$ of N. E. $\frac{1}{4}$ and N. $\frac{1}{2}$ of N. W. $\frac{1}{4}$ of section 28, the N. E. $\frac{1}{4}$ of the N. E. $\frac{1}{4}$ of section 29, township 35 N., of range 8 E., Mt. Diablo meridian, containing 2,320 acres, more or less, according to government surveys. The land described in this deed was what is known as "swamp land." The consideration named in the first deed was $1,000; that in the latter deed, $10,000. The land described in these two deeds, aggregating 2,480 acres, was known, as before stated, as the "Dixie Valley Ranch." On August 1, 1879, D. M. Reavis executed a written instrument which purported to convey to Andrew Reavis, for the consideration of $20,000, a tract of land under the following general descriptions: Sections 21, 22, 23, 24, 26, 27, 28, and 29, township 35 N., range 8 E.; section 12, township 34 N., range 8 E.; and sections 21 and 24, township 36 N., range 8 E. This instrument reconveys to Andrew Reavis all the land mentioned in the deeds of November 3, 1873, except the 520 acres contained in section 20, township 35 N., range 8 E., and, under the general description of full sections, appears to add thereto 120 acres in section 21, 80 acres in section 22, 160 acres in section 23, 520 acres in section 24, 520 acres in section 26, 640 acres (or the whole) of section 27, 520 acres in section 28, 600 acres in section 29, all in township 35 N., range 8 E.; also, 640 acres in section 12, township 34 N., range 8 E., and 1,280 acres in sections 21 and 24, township 36 N., range 8 E.,—making a total addition of 5,080 acres. These full sections mentioned in this instrument contain about 7,040 acres. The land is further described as "including what is known as the 'Willow Springs,' including the Dixie Valley ranch and the water privileges thereunto belonging, and lands therein described, with all the rights, privileges, and appurtenances pertaining to and appurtenant to the Dixie Valley ranch." On August 10, 1879, D. M. Reavis executed a bill of sale to Andrew Reavis, which purported to convey the personal property on the Dixie Valley ranch for the consideration of $10,000. On October 15, 1881, Andrew Reavis entered into an agreement with J. J. Reavis and W. A. Reavis, sons of D. M. Reavis, whereby Andrew Reavis bound himself to convey to J. J. Reavis and W. A. Reavis all lands owned by the grantor in township 35 N., of range 8 E., Mt. Diablo base and meridian, "being from three to four thousand acres of patented land, and all lands, water rights, and range thereto adjoining or connected therewith, owned or claimed by said obligor, being the entire Dixie Valley ranch and range, together with all improvements thereon, all personal property of every nature, including all cattle and horses now on or connected with said ranch or range." The consideration for this agreement was the payment by J. J. and W. A. Reavis of the sum of $17,700, to be paid in four different installments, as follows: $2,700 upon the signing of the agreement; $5,000 on November 1, 1883; $5,000 on November 1, 1885; and $5,000 on November 1, 1887. On January 13, 1885, Andrew Reavis was committed to the State Asylum for the Insane at Stockton, Cal., by order of the superior court of this state in and for the county of Alameda, and D. M. Reavis was appointed as his guardian, and directed to pay his expenses at the asylum. D. M. Reavis, who owned a

tract of land near Chico, Butte county, Cal., and was engaged in the business of stock raising, was at the time of the commitment of Andrew Reavis to the insane asylum heavily indebted to the respondent Clarke, the amount of which indebtedness is stated by complainants to have been $250,000. It appears that on November 1, 1882, Andrew Reavis and J. J. Reavis had joined with D. M. Reavis as accommodation makers in executing notes to Clarke for about $40,000 of this indebtedness. On November 29, 1885, an instrument was drawn up which purported to be a conveyance of the Dixie Valley ranch by Andrew Reavis to D. M. and J. J. Reavis. On January 28, 1886, D. M. and J. J. Reavis visited the insane asylum at Stockton, and there obtained the consent of the superintendent of that institution to remove Andrew Reavis and give him care at home. Accordingly, about 4 o'clock in the morning of January 29, 1886, D. M. and J. J. Reavis took Andrew Reavis from the asylum to a hotel in Stockton; and there, in the presence of a notary public, Andrew Reavis signed the instrument prepared in the preceding November, which instrument was recorded in Lassen county on February 1, 1886. This instrument purports to convey real and personal property described as follows:

"That certain stock ranch and range known as the 'Reavis Dixie Valley Ranch and Range,' and situated in and adjacent to township No. thirty-five north, of range No. eight east, Mt. D. B. and M., and all lands owned by first party situated in said township, and consisting of three thousand acres, more or less, of patented lands, and all other lands, water rights, and range adjoining or connected therewith, and situated in said township or adjacent thereto, owned or claimed or heretofore possessed by first party, and being and composing the entire Dixie Valley ranch and range, together with all improvements thereon and all personal property of every nature, and especially all cattle, horses, and mules now on said ranch or range, or on any lands adjacent thereto or in any manner connected with or belonging to said ranch and range property."

Thereafter Andrew Reavis went to the Dixie Valley ranch, and there died on February 22, 1886. After the death of Andrew Reavis, J. J. and D. M. Reavis managed the affairs of the Dixie Valley ranch until April 27, 1892, on which date D. M. Reavis, his wife, Ann E. Reavis, and J. J. Reavis, their son, by deed conveyed to the respondent Clarke the swamp land and adjoining sections in township 35 N., range 8 E., constituting the Dixie Valley ranch, together with certain other tracts of land in adjoining townships; and on the same day the same parties executed and delivered to Clarke a bill of sale of all the personal property located in Lassen county, in or to which the grantors had any right, title, claim, or interest. The respondent Clarke thereupon entered upon the possession of all the property described in the deed and bill of sale, and has so continued in possession thereof until the present time. On January 2, 1885, Andrew Reavis made what purported to be his last will, by the terms of which he left D. M. Reavis $6,000 "of the $20,000 he owes me," to be distributed equally among himself and wife and children. To various relatives he left certain small legacies. He provided for a debt of $250, other debts, and funeral expenses, and directed that the residue of his estate should be divided equally among his brother James Overton Reavis and his children, his sister Hannah Porter Rossell and her children, and the heirs of Ann Eliza Reavis, deceased. The complainants are

people of modest means, residing in Missouri. They were informed in March, 1886, by D. M. Reavis, that Andrew Reavis had died, and had disposed of his property as directed in the alleged will. Various small sums of money were forwarded to them by D. M. Reavis up to 1892, aggregating in all about $3,500. In 1892 the complainants wrote to D. M. Reavis for the balance of their money. They were dissatisfied with his reply, and sent an attorney as their agent to California to ascertain the condition of the estate. His report caused them to take action to enforce their alleged rights. One Hine, a resident of Lassen county, at their request applied for letters of administration upon the estate of Andrew Reavis, and the superior court of that county issued these letters of administration to him on April 21, 1894. On August 28, 1894, after the time for presenting claims to the administrator had expired, the respondent Clarke presented the notes, aggregating $40,000, in which Andrew Reavis had joined as accommodation maker, for payment. The notes, together with the interest, amounted to $92,327.03. The date of the notes was November 1, 1882. These claims were rejected by the administrator. Complainants allege that these notes had been fully paid by D. M. Reavis in 1886, and that Clarke, with the consent of D. M. Reavis, kept them for the purpose of covering the property in case complainants discovered the frauds alleged to have been practiced upon them; that the respondents have no other claim to the property, except such as they have acquired from Andrew Reavis, and that the respondents therefore hold four-fifths of the property in trust for the complainants; also, that the respondents D. M. and J. J. Reavis have been insolvent ever since 1890, and that Clarke at all times knew that they were so. The prayer of the bill is that a decree be entered declaring the fraud through which the respondents acquired and held prior to April 27, 1892. and since which date Clarke has held and now holds four-fifths of the said property, with the rents, issues, and profits thereof; that four-fifths of the said property belong to complainants; that the respondents account fully for the property; and that Clarke make such conveyances as to vest in each of the complainants his or her title to the property in question.

The respondent Clarke alleges that Andrew Reavis was not the owner of the Dixie Valley ranch; the instrument of August 1, 1879, by which D. M. Reavis appeared to convey the property to Andrew Reavis, being not a deed, but a mortgage. He denies the intestacy of Andrew Reavis, and alleges that the mental condition of Andrew Reavis on January 29, 1886, was not such as to render the deed by which he conveyed the property to D. M. and J. J. Reavis void by reason of his insanity. He further contends that, owing to the laches of the complainants, their cause of action is barred by the statute of limitations of this state. The issue of law as to the statute of limitations was raised in the demurrer to the amended bill, and was decided against the respondent by the overruling of his demurrer. The allegations on the face of the amended bill, therefore, are sufficient to avoid the charge of laches, and the only ground upon which respondent could base this contention on a final hearing would be the failure of the complainants to prove the material allegations of their bill in re-

spect to this part of their case. Respondent, however, does not contend that there has been any such failure, and the testimony shows conclusively the truth of the allegations in this regard. The complainants lived a great distance from California. They had at first entire confidence and trust in D. M. Reavis, and the truth of his statements to them,—a confidence which was strengthened by the receipt of small sums of money from him; and finally, when they were apprised that the condition of their interests was not such as they had been led to believe, they took action to secure what they conceived to be their rights. In Townsend v. Vanderweker, 160 U. S. 171, 186, 16 Sup. Ct. 262, 40 L. Ed. 388, it is said:

"The question of laches does not depend, as does the statute of limitations, upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether, under all the circumstances of the particular case, plaintiff is chargeable with the want of due diligence in failing to institute proceedings before he did. In this case we think the delay is fully explained;" citing Gunton v. Carroll, 101 U. S. 426, 25 L. Ed. 985.

See, also, Lattaillade v. Orena, 91 Cal. 565, 27 Pac. 924, and Hovey v. Bradbury, 112 Cal. 620, 44 Pac. 1077.

It does not appear that in this case, in view of all the circumstances, the defense of laches has been maintained.

It is contended by the respondent Clarke that the instrument of August 1, 1879, which purports to be a conveyance of the Dixie Valley property to Andrew Reavis by D. M. Reavis, is not a deed, but was intended merely to secure certain pre-existing indebtedness, and was therefore a mortgage, and transferred no legal title to Andrew Reavis, in spite of the formal character of the document, which is that of a deed absolute. Authority for the construction of a deed absolute in form as a mortgage, where it is intended as security only, is found in the Civil Code of California (section 2924):

"Every transfer of interest in property, other than in trust, made as a security for the performance of another act, is deemed to be a mortgage, except when in the case of personal property it is accompanied by actual change of possession, in which case it is deemed a pledge."

In the case of Montgomery v. Spect, 55 Cal. 352, the supreme court of this state said:

"Whether a deed absolute in form is a mortgage is a question of intention, to be inferred from all the facts and circumstances of the transaction in which the deed was executed, taken in connection with the conduct of the parties after its execution. In such cases the central fact to be found is the existence of an indebtedness at the time of the transaction, and a continuation of the character of debtor and creditor. If that fact be found, the inference deducible from it is that the deed was not made to transfer the title to the land described in it, but was made for the purpose of securing the debt which the grantor owed to the grantee."

In the case of Brandt v. Thompson, 91 Cal. 458, 27 Pac. 763, Justice McFarland, speaking for the supreme court, said:

"We think the evidence sufficient to warrant the findings of the court that the deed from plaintiff to his brother Herman was given to secure $6,000 borrowed money; that it was, therefore, only a mortgage; and that Thompson knew the nature of said deed when he took his conveyance. And the court was correct in holding that it did not pass the title."

The character of the instrument of August 1, 1879, becomes, therefore, a question of fact, to be determined from the testimony and the circumstances of the case.

The deposition of J. B. Reavis, now a justice of the supreme court of the state of Washington, is to the effect that he drafted this instrument as the attorney for D. M. Reavis. He states further that the conveyance constituted a complete transfer of the property, and that the consideration given by Andrew Reavis therefor was the liquidation of the indebtedness of D. M. Reavis to Andrew Reavis, and the payment of a debt of $15,000 then due from D. M. Reavis to a certain Mrs. Solomon, a widow residing in San Francisco. With regard to this indebtedness of D. M. Reavis, J. B. Reavis deposes:

"The indebtedness due to Andrew from D. M. Reavis, as near as I can recall, aggregated about $20,000, or upward. The amount due Mrs. Solomon was about $15,000, as far as I can remember. I believe I drafted a conveyance from D. M. Reavis to his brother Andrew. I had knowledge of the existence of the indebtedness from D. M. Reavis to Mrs. Solomon, and to his brother Andrew, for a number of years, and had conducted correspondence for D. M. Reavis with both Mrs. Solomon and his brother Andrew relative to the matters, and personally knew Mrs. Solomon. D. M. Reavis had originally purchased, prior to 1874, some rights and interests which his brother Andrew had acquired in Dixie Valley, and he had then engaged his brother to take charge of the properties in Dixie Valley. Andrew had continued in such engagement until the conveyances made to him in 1879 by his brother. The original purchase price, which I cannot now definitely state, was not paid by D. M. Reavis, and only partial payments were made to Andrew on account of wages and salary. In fact, with the exception, I think, of a few hundred dollars, the only payment that Andrew received on account of either the purchase price or for wages was his personal living expenses, which were small. The indebtedness to Mrs. Solomon was for money loaned to D. M. Reavis, and which had been outstanding for considerable time."

In answer to the cross interrogatories, J. B. Reavis testifies that his memory of the details of the transaction is not accurate, that it is 19 years since the execution of the conveyance, and that the matter had not been called to his attention for 15 years. He testifies further that the conveyance was drawn at Chico, in the absence of Andrew Reavis, who was at that time at the Dixie Valley ranch. D. M. Reavis requested the drafting of the conveyance, and gave all the instructions relative to it. The deed, after execution, was delivered to deponent, who forwarded it or took it in person to Susanville for record, and it was there recorded in the latter part of August, 1879. From Susanville deponent went to Dixie Valley ranch, and there discussed the conveyance with Andrew Reavis. Deponent thus testifies with regard to the sources of his information of the indebtedness of D. M. Reavis to Andrew Reavis:

"My knowledge of the consideration from D. M. Reavis to Andrew Reavis for the conveyance of the Dixie Valley real and personal property was received from each of them, but originally from D. M. Reavis. In the fall of 1875 D. M. Reavis told me of the business relations existing between himself and his brother Andrew, and mentioned at that time that he owed Andrew about $15,000. This was just before my first visit to Dixie Valley, in the fall of 1875. I knew from D. M. Reavis and from his brother Andrew that this indebtedness was growing from that time until the time of the conveyances."

It thus appears from the deposition of J. B. Reavis that D. M. Reavis was the instigator of the entire proceedings connected with the convey-

ance of 1879; he directed the whole matter in the absence of his brother Andrew, to whom the property was conveyed; and such information as J. B. Reavis possessed with regard to the amount of indebtedness due to Andrew from D. M. Reavis, in consideration of which the deed was ostensibly executed, is derived mainly from D. M. Reavis. The conveyance itself appears to have been drawn in haste, as it does not accurately describe the land, which at that time stood in the name of D. M. Reavis, but purports to convey the full sections in which the various subdivisions were contained. By this method of description the instrument appears to convey 4,560 acres more than D. M. Reavis claimed to own in those sections in Dixie Valley. Furthermore, there is a repetition in the description of two sections of land, which adds another excess of 1,280 acres. These erroneous descriptions appear to have been sufficient to mislead the counsel for the respondent, as in their brief they say, "The conveyance from D. M. to Andrew Reavis, of August 1, 1879, is a grant, bargain, and sale deed, including eight thousand three hundred and twenty acres." Within the general description of this instrument, D. M. Reavis appears to have had only 2,480 acres standing in his name at that time; and had the instrument been an actual deed of conveyance, in accordance with an agreement of sale, in which the minds of both parties met in the transaction, it is to be presumed that the grantee would have required an accurate description of the lands included in the purchase. But, as appears from the testimony of J. B. Reavis, the grantee or mortgagee was not consulted about the conveyance, or knew of its existence, until after it was recorded. This haste is explained by the fact disclosed by the evidence that very soon thereafter, and during the month of August, 1879, the property of D. M. Reavis in Butte county was attached by his creditors, and proceedings in insolvency were instituted against him and one George W. Gridley, with whom he had been associated in some business transactions. It appears further that in these proceedings D. M. Reavis made a transfer of his property to trustees for the benefit of his creditors, and at a meeting of those creditors Reavis made a statement concerning the conveyance of the Dixie Valley property, to his brother Andrew on August 1, 1879. F. C. Lusk, who was the attorney for the creditors after Reavis had made the assignment, testifies that Reavis' statement to the creditors was to the effect that the conveyance to Andrew Reavis was as a security for an indebtedness. The testimony of Lusk is as follows:

"Q. Do you remember what was commonly known as the 'Reavis Failure,' or the 'Reavis Trust,' in 1879? A. I remember the failure of Mr. David M. Reavis in the fall of 1879. Q. Did he at that time make a transfer to trustees? A. Soon after the failure, after the settlement with the creditors (he and Mr. Gridley failed together), they made an assignment to John Boggs, E. W. Pond, and C. W. Clarke, as trustees for the benefit of the creditors. Q. Who acted as attorney? A. I did, after the assignment. Q. Were you present at any meeting of the creditors in which statements were made by D. M. Reavis respecting the transfer of what is known as the 'Dixie Valley Stock and Property' to Andrew Reavis, and the purpose and consideration? A. I was present at all of the meetings of the creditors (they were all held in my office, except the first one, which was in the Chico Hotel), and heard Mr. David M. Reavis make a statement to the creditors in regard to the subjects you

speak of. \Q. What were these statements? A. He stated to the creditors that he had transferred his ranch in Tehama county, his stock ranch in Dixie Valley, and the stock on the Dixie Valley ranch, for his brother Andrew to hold as security for an indebtedness which he stated to the creditors he owed his brother Andrew, of about $33,000, and of the indebtedness which he stated he owed a Mrs. Solomon (at Napa, I think she lived), of about $16,000. * * * The creditors asked him if he could not get these properties back, and turn them in to the general trust. He told them that he could not get them back, and the creditors could not get them back unless they paid Andrew what was due, and paid Mrs. Solomon what was due her. This was the principal statement in reference to it that I remember. That was repeated a good many times in those meetings of creditors. Q. Did you hear J. J. Reavis or D. M. Reavis. or either of them, testify upon the subject at the subsequent trial,— the trial subsequent to the first event that you have spoken of? A. Yes; I heard them both testify at Oroville at the trial,—the action that was brought by G. W. Gridley in his lifetime, and continued by his administrators after his death, to settle the estate,—this whole settlement which had been made relating to the Reavis-Gridley failure. Q. What did they state, in their testimony, was the purpose of the transfer? A. They stated in their testimony substantially the same thing. They both stated that this property had been transferred to Andrew Reavis as security for that indebtedness of Mr. Reavis, [in] telling the amount in his testimony that he owed his brother Andrew Reavis, he placed it at about $20,000,—about $20,000 or near $20,000. I don't think that he made out that he owed him just exactly $20,000, but that was about the indebtedness to his brother. Otherwise, there was no change in their testimony on the trial, in their statement, from Mr. D. M. Reavis' statement in the meeting of the creditors."

J. J. Reavis, testifying with regard to the consideration of the transfer, says:

"The property was deeded out to Andrew Reavis to pay him all my father was owing him, and also to pay Mrs. M. S. Solomon, of San Francisco, $16,000 that he owed her. Q. What amount, if you know, was then due from your father to Andrew Reavis? A. At that time, I don't know, but subsequently I heard father testify that he considered that he owed Andrew Reavis at that time $20,000."

Testimony alleged to have been given by the same witness in the Gridley case, in which this property was involved, was read to him, as follows:

"I think I heard father say that he had turned it [the Dixie Valley property, complete] over to secure Uncle Andrew and Mrs. Solomon. Q. To secure what? A. Uncle Andrew and Mrs. Solomon, of Dixie Valley. Q. Did he say for what? A. No."

The witness admitted that such had been his testimony in the Gridley case.

The witness Lusk testified that Andrew Reavis had informed him as follows:

"Q. Did you subsequently have a conversation with Andrew Reavis upon the subject of the transfer to him of the Dixie Valley stock and real property? A. I had subsequently at least two conversations with Andrew Reavis upon that subject. * * * The first conversation was in my office at Chico, but the time I am utterly unable to recollect, except that I know it was after the failure, after the assignments were made, and before the summer of 1881. * * * Q. What did Andrew Reavis state was the purpose of the transfer to him? A. It was after the assignment to Andrew. I am not certain whether it was after the assignment to the trustees or before, but it was after the assignment to Andrew. He came to my office and stated to me that Mr. Reavis had transferred this property to him without his knowledge; that he knew nothing about it until after they were placed on record; that he didn't want

anything to do with it, but that he would do anything that Dave said for the purpose of helping (as he called her) Betty. It was Mrs. David M. Reavis. He told me that he wanted me to understand that, in case of any litigation, if he was put on the stand he would not swear to the statement Mr. David M. Reavis made. He said Mr. David M. Reavis didn't owe him any such amount of money as he had stated to the creditors, and that if he were put on the stand he should be obliged to tell the exact truth. He said that, after the assignments were made, they [referring to some of the Reavis family] had told him they had assigned him this to hold as a security for what Dave owed him, and for what Dave owed Mrs. Solomon."

Lusk further testifies that Andrew Reavis told him that he must not put him upon the stand in the Gridley case, as they might draw facts out of him to the detriment of D. M. Reavis. On the same occasion, according to this witness, Andrew Reavis informed him that D. M. Reavis' indebtedness to him did not exceed $7,000, and said:

"There is a note that I have, that I had at the time of the failure. That is all he owed me. I have no interest in this place, any more than I ever had. I am working down there for wages. I don't want anything to do with it. I want to get it out of my hands. But if Dave wants me to keep it, for his children to have it, and Mrs. Solomon, I will do what he wishes. I will deed it, or anything. I don't want to be put on the stand. I am not interested in this place at all."

Carlton, the vaquero of the Dixie Valley ranch, says:

"He [Andrew Reavis] told me that Dave owed him about $7,000, and that Dave had put that property into his hands to hold for that money."

Testifying further upon the same point, he says that the conversation in which the foregoing statement of Andrew Reavis occurred took place in 1879, and that Andrew subsequently said that his demand against D. M. Reavis had been paid. The statement of the payment of the demand against D. M. Reavis was, according to Carlton, made to him in the spring of 1882. This latter testimony of Carlton conflicts with that of W. A. Reavis, who testified that Andrew Reavis and Carlton were not on good terms and never spoke between the years 1880 and 1884; a dispute having arisen between them, in consequence of which Carlton left Dixie in March, 1880. The direct testimony as to the amount of the indebtedness of D. M. to Andrew Reavis, as given by J. B. Reavis, is thus contradicted by the testimony of Lusk and Carlton. The former claims to have derived his information with regard to the indebtedness being of the amount of $20,000 from D. M. Reavis. The two latter refer the statement that the amount was $7,000 to Andrew Reavis.

The dealings of Andrew Reavis, as regards the property, subsequent to the alleged conveyance of 1879, tend to show that his actions with respect to the Dixie Valley ranch were not those of an absolute owner, but that he rather occupied the position to which the relations of the parties, provided the transfer is to be regarded as security for indebtedness, would assign him. There is no question that Andrew had been a workman upon the ranch, laboring under the direction of D. M. Reavis, subsequent to the conveyance of the property in 1873, and he continued so to work subsequent to the conveyance of 1879. D. M. Reavis practically controlled the operations of the Dixie Valley ranch. Carlton, who worked with Andrew at the ranch, testifies that D. M. Reavis paid him for his work. W. A. Reavis, however, testifies that

the help was paid by Andrew Reavis. In March, 1880, Carlton quarreled with Andrew Reavis and left the ranch, or was discharged; the evidence being contradictory upon that point. At any rate, it is clear that there was a dispute between Carlton and Andrew Reavis, the subject of which throws some light upon the position which D. M. Reavis held with regard to the property after the transfer of 1879. With regard to this Carlton testifies as follows:

"Q. Well, do you recollect any particular reason for your leaving there in the spring of 1880? A. Well, me and Andy didn't exactly agree on the way the cattle had been handled that winter. Q. He was not satisfied with your work? A. He didn't say nothing about the work. The work was all right. * * * Q. And you left in consequence of it [quarrel with Andrew]? A. Yes, sir; I left. He told me that Dave wanted me down to the other ranch."

J. J. Reavis says that Carlton was working for Andrew at the time he was at Dixie in the fall of 1879, and upon the subject of Carlton's departure from Dixie, testifies:

"I went there in March, 1880. I met old Carlton. Uncle Andy discharged him—sent him away from there—in 1880, and I met him on the road by about Montgomery creek, coming out."

In view of these conflicting statements, Carlton's testimony cannot be regarded as entirely reliable; but the circumstances, as admitted by complainants' witnesses, tend to bear out his statement that D. M. Reavis was practically in control of the Dixie Valley ranch at the period subsequent to the transfer of the property by the deed of 1879, when, according to complainant's contention, Andrew Reavis was entirely and absolutely the master and owner. There is no question but that such pecuniary advantage as was reaped from the management of the ranch was gained by D. M. Reavis, that his necessities determined the policy with reference to the ranching operations, and that Andrew does not appear to have derived any increase in material prosperity from the sudden possession of an extensive and valuable property. It may be admitted that, as Andrew had for many years been in constant attendance at the ranch and familiar with its working, no immediate and remarkable change in its methods of management need have been anticipated from the transfer. But, from an owner and a practical rancher, as Andrew was, one might reasonably have expected some evidences of individuality and of personal opinion as to the conduct of things, which appear to be entirely wanting. As to the actual carrying on of the business, complainants endeavor to show that the supplies were purchased by Andrew for Dixie Valley, and were paid for by him. The testimony on this point, however, is very far from conclusive, and rests chiefly upon the evidence of J. J. Reavis. On May 1, 1882, Andrew Reavis mortgaged the 2,320 acres of swamp land to one L. C. Stiles, of Susanville, for the sum of $4,000, giving a promissory note for that amount, payable on October 1, 1882, with interest at the rate of $1\frac{1}{2}$ per cent. per month. This money, it is maintained by complainants, went in the payment of running expenses in connection with the Dixie Valley ranch, but there is no evidence to show that the money was so expended. W. A. Reavis says on this point:

"Q. I simply want to get that money that he gave the mortgage to Stiles for. I want to get what was done with that money. You can state it in

your own way. Just give me the name of the man it was paid to, and what for. A. Oh, I could not tell you directly what men it was paid to, but there was bills that were incurred there,—at Green & Asher's there was bills, and at Fall City, and bills at Adin. Q. How much was paid Green & Asher? A. I could not tell you how much. Q. When was it paid? A. I don't know when it was paid. It was paid before I went up there in 1882."

The witness then went on to say that he knew nothing personally of the disposal of the money that was derived from the Stiles mortgage, and that what information he had he derived from his uncle Andrew, although he had previously stated that the money had been expended by Andrew for the expenses of the ranch.

Complainants place in evidence that part of the assessment roll of Lassen county for the years 1880 to 1885 which relates to the Dixie Valley ranch. This assessment is made in the name of Andrew Reavis, but this fact of itself is immaterial, and is not evidence of ownership. The land was admittedly held in the name of Andrew Reavis, formal deed having been made to him of the property, and duly recorded. The patent to 2,320 acres of swamp land was issued to Andrew Reavis on March 3, 1880. He had paid $556.80, or 20 per cent. of the purchase price, for this land on August 12, 1873, and the interest on the balance to January 1, 1874. The interest under the certificate of purchase was transferred by A. Reavis to D. M. Reavis on January 4, 1877, the consideration named being $2,000, and back to A. Reavis by D. M. Reavis on August 1, 1879, simultaneously with the transfer of the Dixie Valley ranch by the alleged deed. Lusk testifies that D. M. Reavis retained possession of the certificate of the swamp land in Dixie Valley, and that he made the further payment necessary to procure the patent for the land. It cannot be said that the acts of Andrew Reavis evidence any real ownership of the property by him, or that they indicate any particular interest, any more than he had always been accustomed to show as the employé of D. M. Reavis, whose interests he always appears to have served zealously, out of regard for the family of the latter, for the members of which he evidently entertained a very warm affection. The complainants' principal witness, J. J. Reavis, fails to disclose any real difference in the mode of conducting the ranch under Andrew Reavis' management. An instance of the control exercised by D. M. Reavis over the Dixie Valley ranch at the time when Andrew Reavis was supposed to be the owner occurs on the sale of certain cattle to the Lynch Bros. These cattle were sold in the fall of 1879, the reason assigned for their sale being the fact that D. M. Reavis wanted the money, which he received forthwith, he being at the ranch at that time, and went off to Chico immediately after getting the check in payment of the cattle. Every fall such cattle as were fit for sale were sent to Chico, and there disposed of by D. M. Reavis, who managed the sales and received the money. This money was not deposited in the name of Andrew Reavis, as might have been expected, since the cattle came from the Dixie Valley ranch, but in the name of D. M. Reavis or his wife. J. J. Reavis, in testifying upon this point, says that he put the money, the proceeds of one of these sales, in the bank to the credit of his mother; that all the moneys then used at the Chico ranch were deposited in her name, and were really put

there for use by his father, D. M. Reavis. The money obtained from the sale of cattle from the Dixie Valley ranch appears, therefore, to have gone into the general fund used by D. M. Reavis in carrying on his business, and there seems to have been no method of distinguishing what was the product of sales of Dixie Valley stock from the sales of other stock possessed by D. M. Reavis and placed upon the market. J. J. Reavis testifies that he held power of attorney from Andrew Reavis, under the terms of which he made sales of cattle, and that he gave the money realized from such sales to D. M. Reavis, under the special orders of Andrew Reavis. Thus he says, "Uncle Andy Reavis told me to help my father, if I could,—to let him have whatever money he wanted,—and I did so." And, testifying further in the same behalf, he stated that his uncle gave D. M. Reavis the money from the sale of stock whenever he wanted it, or needed help. But there does not appear to have been any account kept of such money. Andrew Reavis apparently never demanded it, and there is no evidence of any settlement or accounting in the matter of these sales, and the money turned in therefrom to D. M. Reavis. In fact, the testimony goes directly to show that there was no such accounting. J. J. Reavis, when asked, "Was there ever a settlement from your father, accounting for that much money to pay it back to your uncle Andrew?" replied, "None that I know of, sir." In 1886 a lot of cattle were sold to Henry Hayes, of Oakland. J. J. Reavis testifies that he sold these cattle as the attorney of Andrew Reavis, and that D. M. Reavis got the check for the sale and paid it over to Clarke. He explains that this occurred in accordance with the general instructions of Andrew Reavis that D. M. Reavis should be helped with funds when necessary. Then when asked, "Was there ever a settlement from your father, accounting for that much money to pay it back to your uncle Andy?" he replied, "None that I know of," and still further testified that he never heard of any effort being made by Andrew Reavis to collect from D. M. Reavis the amount which would have been due to him by virtue of these repeated sales of cattle, the money for which was always absorbed by D. M. Reavis without any acknowledgment or account kept.

Complainants' counsel, in their opening brief, have drawn up what they denominate an "account of the output of the Dixie Valley ranch," according to which they make out a total indebtedness of D. M. Reavis to Andrew Reavis of $10,350. This was made, according to the unsupported testimony of J. J. Reavis, after a long interval of time. This witness testified that an account of the output had been kept and placed in a trunk in a room at the Dixie Valley ranch, but was subsequently lost. Such account appears, at the most, to have been merely a memorandum of the amount of cattle sold, and not to have evidenced any indebtedness on the part of D. M. Reavis therefor. With regard to the Hayes transaction mentioned above, J. J. Reavis testified, in answer to an inquiry as to whether D. M. Reavis gave any receipt, or if any paper passed: "None that I know of, sir. Q. No account was taken of it? A. None that I know of,—only this memorandum that I kept of it." In fact, the entire testimony with regard to the management of the ranch goes to show that D. M. Reavis retained his authority over it as before, and that Andrew was after August 1, 1879, as he

had been ever since 1873, the subordinate of his brother, in no wise acting as if he were owner and in control of the property.

Reference is made in the testimony of J. J. Reavis to an alleged agreement with Andrew Reavis, under which the latter, upon the receipt of $20,000, undertook to make a deed of the entire property to J. J. and W. A. Reavis. This agreement or bond to give a deed was made on October 15, 1881, and provided for payment in four different installments. The complainants contend that this bond shows the actual ownership of the property by Andrew Reavis. It is claimed that it was made for the purpose of giving the young men, in whom Andrew Reavis always took a great interest, an opportunity of purchasing the property. J. J. and W. A. Reavis both testify that they regarded the bond as genuine, and that they considered that under its provisions they were entitled to certain rights in the property. J. J. Reavis testifies that the bond was made at the suggestion of Andrew Reavis, and that he also proposed the terms upon compliance with which the transfer would be made by deed to them. This, also, is the gist of the testimony of W. A. Reavis in this regard. The bond was signed at Big Meadows, in Plumas county, to which place it was taken from the office of Lusk, an attorney who prepared it, by J. J. Reavis. W. A. Reavis assigned his interest under the bond to D. M. Reavis at the latter's instigation, being persuaded thereto by his mother. D. M. Reavis on November 5, 1885, in turn assigned it to Clarke. J. J. Reavis did not assign his interest under this instrument. Lusk testifies that the bond was made without the knowledge of J. J. and W. A. Reavis, and was intended merely to serve an immediate purpose. He says:

"That instrument, which is ordinarily called a 'bond.' was drawn by me in my office in Chico, with the exception of a change which has been made since I drew it. When it left my office the sum of $5,000, I think, was in the first blank, which has been erased by somebody, and $2,700 inserted in its place. It was drawn by me for an even $20,000. I don't know anything about that erasure and insertion. It has been done after it left my hands."

He says further that Andrew Reavis was not present at the drawing of the bond, and that he received no instruction from Andrew Reavis to draw it; that neither J. J. nor W. A. Reavis was present, and that they gave him no such instruction; and that none of those three parties had any knowledge that the bond was to be drawn prior to its being drawn. The bond was made, according to the same witness, at his suggestion, and for the protection of D. M. Reavis. The $20,000 was, he says, named without any regard to its representing anything. It was merely a fictitious sum. The reasons given for his drawing it are thus stated by Lusk:

"I had the bond drawn because the title to the property stood in the name of Andrew Reavis, which did not belong to him; and I thought, if he should happen to die, and his estate be probated, that that might trouble Mr. D. M. Reavis. So I suggested to Mr. D. M. Reavis the device of this bond. I could not take— I could not have Mr. Andrew Reavis give a bond or make a deed direct to Mr. D. M. Reavis, because Mr. D. M. Reavis, when he made a settlement with his creditors, had made a private settlement with some of them without my knowledge; and I knew that if it became known the balance of the creditors could break up the whole settlement, and come on him for the original amount of their debts. For that reason I could not take a

bond or have a deed made to him. I suggested this bond to his children, and drew it right up there at the time, and he accepted the idea."

As regards the statements of J. J. and W. A. Reavis that they regarded the bond as of great importance to them, it must be noted that there is no evidence showing any effort upon their part to live up to its terms. There does not appear to have been any accounting or settlement between them and Andrew Reavis under it. The only testimony that seems to imply that Andrew Reavis considered anything due to him under its provisions is a statement on the part of J. J. Reavis that Andrew complained that they were not living up to the contract, and one from W. A. Reavis that Andrew in 1882 talked about the payment of money on the bond. J. J. Reavis also says that in 1883 Andrew Reavis was desirous of purchasing some property, and was anxious that they should make a payment on the bond. On cross-examination this witness remembered no particulars as to Andrew Reavis asking him for money under the bond, and his excusing his nonpayment upon the ground that his father, D. M. Reavis, was absorbing all the money, which was the reason given in his direct testimony why Andrew Reavis had not been paid. The same witness testified that he received no wages, and had no settlement with Andrew Reavis for wages, and seems to desire to give the impression that the contract under the bond was the only arrangement between them. In fact, he says categorically, "I was there in possession under that contract;" and, when asked what contract, he replied, "That bond." He never rendered any account for wages to Andrew Reavis, nor asked for payment of them. But, according to J. J. Reavis' testimony, this nonreceipt of wages by him appears to have been not unusual. Thus, when asked, "How did you get your wages?" he replied:

"I got them wherever I could. The same way I say with Mr. Clarke when I was under contract with him,—his agent up there,—I was to receive nothing for my wages."

Upon this point Lusk testified, when asked if J. J. or W. A. Reavis had anything to do with the Dixie Valley ranch:

"Nothing whatever, except that J. J. Reavis stayed up there working for his father, representing his father up there at the ranch, in part, and representing Mr. Clarke, without any pay from Mr. Clarke. Mr. Clarke had bills and morigages. There were not mortgages on the cattle, but there were bills of sale. He got Mr. J. J. Reavis to stay there to represent him and to be in possession for him, so that, if the creditors attached, he could say for J. J. Reavis that he was in possession."

It does not appear that the existence of this bond constitutes any proof of the real ownership of the Dixie Valley property by Andrew Reavis. The whole transaction is inexplicable upon the ground that it was a bona fide instrument, intended to accomplish the purposes which, according to the complainants' contention, were desired by Andrew Reavis. There is no satisfactory proof that Andrew Reavis ever regarded it seriously, and at least it has not been shown that he made any real effort to obtain any of the installments of money which he should have received according to its provisions.

On October 28, 1882, a check was drawn in favor of Andrew Reavis for $4,500. This check was signed by C. W. Clarke, and indorsed,

"Andrew Reavis, by D. M. Reavis and E. B. Pond," and is stamped upon the face, "Receiving Teller, October 30, 1882, First National Gold Bank, San Francisco." On November 1, 1882, another check was drawn in favor of Andrew Reavis for the sum of $5,000. This check is signed, "Clarke & Cox," and is stamped upon the face, "First National Gold Bank of San Francisco, please pay. November 1, 1882. California State Bank." It is indorsed, "Andrew Reavis." These two checks aggregate $9,500, and the payment of this sum is regarded by the respondent in the light of a settlement which finally disposed of Andrew Reavis' interest by the complete payment of the amount in which D. M. Reavis is indebted to him. This transaction is referred to as the settlement of November 1, 1882. Complainants do not regard this transaction as a settlement of the nature contended for by respondents, but maintain that the money was advanced for the payment of what is known as the "Stiles Mortgage," and an installment upon the Solomon debt. The Stiles mortgage has been already referred to, and the $4,000 borrowed from Stiles by Andrew Reavis, and secured by a mortgage on Dixie Valley ranch, fell due on October 1, 1882. The Solomon debt, which was originally $16,000, had been reduced to $12,000 by agreement, and was to be paid off in three installments, the first of which was due on November 1, 1882. At the end of October, 1882, Andrew Reavis left the Dixie Valley ranch for Chico, in company with W. A. Reavis. On the way a horse died, and they were delayed in their journey so that when they arrived at D. M. Reavis' ranch at Chico he was no longer there. Andrew Reavis, according to the testimony of W. A. Reavis, appeared to be disappointed at this, and remained only one day in Chico, whence he set out for Sacramento, whither D. M. Reavis had already gone. After the arrival of Andrew Reavis in Sacramento, the two checks above described were paid over,—the one on October 28, 1882, for $4,500; the other on November 1, 1882, for $5,000. On November 1, 1882, two notes were given to Clarke, signed by D. M. Reavis, Andrew Reavis, Mrs. Ann Reavis, and J. J. Reavis. One of these notes was for $15,000, and the other for $25,000, aggregating $40,000. The witness Porter was present at these transactions, and states that there was a settlement then of the affairs of Andrew and D. M. Reavis, according to the terms of which Clarke was to advance the money for the payment of the debt of D. M. to Andrew Reavis, and thereupon Andrew Reavis would redeem the Dixie Valley ranch to D. M. Reavis, and that a check for $5,000 given on that day was for the indebtedness of D. M. Reavis to Andrew Reavis. There is other testimony to the effect that this arrangement was entered into and so understood by Andrew Reavis. Carlton testified that Andrew told him at Chico, some time "during the summer or fall," that he was not going back to Dixie Valley ranch; that he had fixed up his business, and was waiting on D. M. Reavis to get his money from Mr. Clarke to pay him; that he had "sold Dixie Valley ranch, and was going to leave there forever." Again, testifying on the same point, Carlton says that Andrew told him that he had been paid, and that he was going to Oakland that winter. Some of these statements are, however, open to suspicion. There is no evidence that Andrew returned to Chico subsequent to his visit to

Sacramento until 1884, and he spent only one day in Chico on the way down to Sacramento in the fall of 1882. Moreover, W. A. Reavis has testified that Andrew Reavis and Carlton were not on speaking terms between the years 1880 and 1884, and the unfriendliness of their parting in 1880 seems to be beyond question. But Lusk, who was familiar with all the business transactions of Andrew and D. M. Reavis, testified as follows:

"Q. Do you know of any settlement or payment from D. M. to Andrew Reavis of the indebtedness existing from D. M. to Andrew? A. At a time after the giving of this bond? I could not tell the date unless something was to refresh my memory. Andrew Reavis was down there, and they had a settlement. Q. Down where? A. Down at Chico; down in that country. They had a settlement, but whether the settlement was made in my office or not. I don't remember. All I know is that Andrew Reavis told me that Dave had paid him up entirely, and Dave told me that he had paid Andrew entirely. They both told me that the money came from Mr. Clarke, but whether the payments or the checks were transferred in my office, I could not tell. * * * Q. Is there anything by which you can refresh your mind as to the settlement already testified to between D. M. and Andrew Reavis? A. Do you mean the time when D. M. Reavis paid Andrew Reavis what he owed him? Q. Yes; that they had a settlement. I ask you if you can fix the time."

This the witness was unable to do. He was satisfied that it occurred after 1881, but he was not sure whether it was within three years of the bonding of the property in that way.

The respondent Clarke testifies that he saw Andrew Reavis on October 27, 1882, at D. M. Reavis' place at Chico; that, in reply to his inquiries, Andrew Reavis declared that he and his brother had been talking with regard to a settlement, and that Andrew wanted some money at once, whereupon he (Clarke) drew a check for him in the sum of $4,500; that there was no settlement arrived at until November 1st. He says that they "finally came to it."

"Q. Well, what was it finally fixed at, to name the amount? A. Well, then there was $5,000 more coming to him. $9,500 they claimed the settlement was. Q. That was a settlement for what? A. That was a settlement they had between them,—that Dave Reavis owed Andy Reavis. Q. Who paid that? A. I did."

On cross-examination the same witness testifies that he drew a check on October 28th in favor of Andrew Reavis, and gave it to him, and a check for $5,000 in favor of Andrew Reavis on November 1st. In the course of his redirect examination Clarke corrects his testimony, and says he was mistaken in testifying that he went to the ranch with Andrew Reavis on October 28th, but that Andrew Reavis was in Sacramento at that date. The direct testimony as to there having been a final and complete settlement between the two brothers at this date cannot be considered as entirely conclusive of the fact, but the witnesses all agree, and the checks show that $9,500 was paid over to Andrew Reavis on the dates named. The amount of indebtedness due from D. M. Reavis to Andrew Reavis at the time of the transfer of 1879 is stated by respondents' witness Carlton and by Lusk to have been $7,000, as admitted to them by Andrew Reavis.

The complainants contend that the checks given to Andrew Reavis on October 28th and on November 1st were not given in settlement of the debt of D. M. Reavis to Andrew Reavis, but were advanced in

order to meet the Stiles mortgage and the first installment of the Solomon debt. It is urged, also, that they were given to Andrew Reavis in order to obtain his signature to the notes aggregating $40,000 made to Clarke at that time, and signed by Andrew, D. M., J. J., and Ann Reavis. Complainants' witnesses testify that Andrew was particularly worried with regard to these two matters, and the fact that the Stiles mortgage was overdue seems to have given him much anxiety. But there is no evidence of any understanding between him and Clarke in this matter. The $5,000 check paid to Andrew Reavis on November 1st was indorsed and cashed by him in Sacramento on November 1, 1882. From the copies of the waybills of Wells, Fargo & Co.'s Express, it appears that $4,310 were sent from Sacramento to L. C. Stiles in November, 1882, in three amounts,—two of $1,500 each, and one of $1,310. The first of these amounts was shipped on November 1, 1882, and on November 25, 1882, satisfaction of the mortgage was acknowledged by Stiles. J. J. Reavis states that Andrew Reavis told him "that father had got the money on his account to pay Mrs. Solomon, and that he [Andrew Reavis] had got $5,000 from Mr. Clarke to pay Mr. Stiles, and some other debts that he owed, and that he had paid Stiles, and sent the money through Wells, Fargo & Co., in three different amounts, of $1,500." The contention of the complainants that Andrew Reavis applied a great portion of the $5,000 received from Clarke to the satisfaction of the Stiles mortgage appears to be borne out by the facts.

It is claimed by the complainants that the $4,500 advanced by check to Andrew Reavis by Clarke on October 28, 1882, was used by D. M. Reavis for the payment of the first installment of the Solomon debt. This debt was originally $16,000, and the payment of it part of the consideration which, according to complainants' witnesses, Andrew Reavis gave for the transfer to him of the Dixie Valley property in 1879. Clarke testifies that this indebtedness had by compromise been reduced to $12,000, payable in notes of $4,000 each. The first of these notes fell due on November 1, 1882. Clarke promised Andrew Reavis to see that this note was paid, before the latter consented to become a surety upon the notes, aggregating $40,000, which D. M. Reavis gave Clarke on November 1, 1882. Clarke says that he gave Andrew Reavis the check of $4,500, with which to pay that part of Mrs. Solomon's indebtedness which was due on November 1, 1882. He says elsewhere, however, that the check of $4,500 was for the purpose of making a settlement between D. M. and Andrew Reavis. Pond, one of the indorsees of the check for $4,500 to Andrew Reavis, could not determine whether any of it was applied to the payment of Mrs. Solomon's first note. There is no direct evidence to show that it was so applied. It is evident, however, from the testimony, that Andrew Reavis was anxious with regard to the Solomon note; that he refused to become surety on the notes to Clarke, amounting to $40,000, until he was assured that this indebtedness was met, and when the first Solomon note was paid he signed the notes accordingly. The testimony with regard to the first of these Solomon notes tends to show that it was not paid by Clarke, but was paid either by means of the $4,500 check which Andrew received from Clarke on October 28, 1882,

or from the money which Clarke advanced to D. M. Reavis at that time.

With regard to the payment of the balance of the Solomon debt, the following facts are stipulated by counsel for both parties: In the early part of 1882 this indebtedness was settled by giving Mrs. Solomon three notes, for the sum of $4,000 each, signed by D. M. Reavis and his wife, and also by J. J. Reavis and Andrew Reavis. Two of these notes were deposited by Mrs. Solomon for collection in the Santa Rosa bank, and this in turn sent them through to the London & San Francisco Bank of San Francisco; and the amount of principal and interest on the notes to that date, in the sum of $8,213.33, was paid to the last-named bank on May 7, 1884. A check for this amount was put in evidence by respondents, signed by Clarke & Cox, dated May 7, 1884, and stamped on the face: "Paid May 8, 1884. California State Bank." It thus appears that Clarke paid the money to clear up the Solomon debt. In order to show that D. M. Reavis was sufficiently indebted to Andrew Reavis to warrant this advance of money on the part of Clarke, complainants' counsel referred to the alleged statement of account which has been already noticed, but it furnishes no proof with regard to this matter. There is no question but that this remainder of the Solomon debt was discharged by Clarke. Complainants' counsel say that it is admitted by Clarke that he promised Andrew Reavis, before the latter agreed to become surety upon the note to the extent of $40,000, that he would pay the Solomon indebtedness. But this is not established by the testimony. Clarke agreed to see that the $4,000 due to Mrs. Solomon on November 1, 1882, was paid, but there was no promise made by him with respect to the remainder of the debt. It appears, therefore, that Andrew Reavis did not pay the Solomon debt, the payment of which, according to complainants' contention, formed part of the consideration of the transfer of the Dixie Valley ranch to him in 1879. Whether the settlement of November 1st terminated the indebtedness of D. M. to Andrew Reavis or not, the payment of the two checks upon that day, and the arrangement for the payment of the Solomon notes, was followed by the departure of Andrew Reavis for Oakland, and the cessation of any active interest on his part in the affairs of the Dixie Valley ranch. Andrew Reavis first absented himself from the ranch in 1881, about December, when he went to Los Angeles. In February, 1882, he returned to the ranch, where he remained until after the settlement of November 1, 1882, after which he again went down to Oakland, and, according to the testimony of W. A. Reavis, returned in May or June of that year 1883, afterwards calling at Chico, and going down to Oakland again in the fall. W. A. Reavis also testifies that in 1884 Andrew returned to Dixie again, but this merely upon hearsay, for he was in Oakland again when W. A. Reavis returned from Washington Territory in that year. Carlton, however, testifies that he never saw Andrew Reavis at Dixie after his departure for Oakland in November, 1882, until he came up in 1886, during his last illness. The fact appears to be beyond doubt that Oakland was Andrew Reavis' home after the settlement in 1882, and that his connection with the ranch thereafter was merely incidental. Counsel for complainants rely upon

a letter written by Andrew Reavis December 22, 1884, to support their contention of his continued interest in the ranch; but the letter contains no anxious inquiry as to conditions at Dixie. In fact, the only reference to the ranch consists in the following sentence: "When do you return to Dixie, and are you coming down, as I'll be glad to see you." The contention of complainants in this respect that Andrew Reavis, after giving the bond to W. A. and J. J. Reavis, felt at liberty to leave the entire management of the property in their hands, is supported by the fact that Andrew went away—took his first vacation—soon after that transfer, and that thereafter his duties to the property absorbed but a small part of his interest and attention. But there is no evidence of any payment being made to him under the bond, and it does not appear that he derived any means of subsistence while in Oakland from the proceeds of the Dixie Valley ranch, with which his actual connection was severed subsequent to November 1, 1882. It appears from the evidence, therefore, that at no time after the transfers of 1879 did Andrew Reavis exercise the rights and powers of owner over the Dixie Valley property, and that after November 1, 1882, his connection therewith was dissolved, and his occasional visits to the ranch were not made in pursuance of any rights which he retained therein. From this evidence the conclusion follows that the mortgage and the bill of sale of 1879 were given to secure the indebtedness due from D. M. Reavis to Andrew Reavis, and operated only as a mortgage with regard to the realty, and a pledge with regard to the personalty, of the Dixie Valley ranch. The legal title to the property continued, therefore, to be vested in D. M. Reavis, so that no reconveyance was necessary from Andrew to D. M. Reavis, if the indebtedness to secure which the mortgage had been placed upon the property was discharged by the settlement of November 1, 1882. But, if that settlement did not constitute a discharge of this indebtedness, the instrument of August 1, 1879, being a mortgage, became subject to the operation of the statute of limitations of the state of California within four years after its date, unless the indebtedness was evidenced by a writing making it payable at a future time. Section 337, Code Civ. Proc.; Newhall v. Sherman, 124 Cal. 510, 57 Pac. 387. The Dixie Valley ranch was therefore held by D. M. Reavis as his property until April 27, 1892, on which day he conveyed it to Clarke by deed and bill of sale, signed also by Ann E. Reavis and J. J. Reavis. The respondent Clarke was thus vested with the legal and equitable title to the property in controversy.

There remains to be considered the claim of the complainants that after the transaction concerning the Dixie Valley property between D. M. and Andrew Reavis, in August, 1879, and independent of the conveyance of August 1, 1879, the latter acquired title to certain tracts of land in township 35 N., range 8 E., amounting to 560 acres—First, by homestead entry, 160 acres; second, by pre-emption entry, 160 acres; and, third, by transfer of title from J. B. Reavis to Andrew Reavis to 240 acres of desert land. With respect to the first two tracts of land it is sufficient to say that the attention of the court has not been called to any evidence identifying them with certainty. The testimony of J. J. Reavis that Andrew Reavis did at some time acquire

160 acres of land by homestead entry and 160 acres by pre-emption entry is not sufficient. Andrew Reavis, on the 16th of August, 1873, writing from Dixie Valley to his brother D. M. Reavis concerning their affairs in Dixie Valley, refers to his own pre-emption of 160 acres, and the fact that his house stands upon this land. It has been suggested that the subsequent deed of November 3, 1873, wherein Andrew Reavis executed a separate conveyance to D. M. Reavis for 160 acres of land, was a conveyance of this land acquired by Andrew Reavis by pre-emption. This identification appears probable. The land is described as the S. ½ of the N. E. ¼ and the N. E. ¼ of the N. E. ¼ of section 20, and the N. W. ¼ of the N. W. ¼ of section 21, in township 35 N., range 8 E., containing 160 acres. This tract of land is, however, included in the mortgage of August 1, 1879, and is subject to the conditions of that instrument. With respect to the homestead entry the evidence is still more uncertain. It appears that Andrew Reavis first visited Dixey Valley in the early 60's, and that he resided there as early as 1872. There is therefore nothing improbable in the conjecture that he might have perfected a homestead entry and conveyed the title to D. M. Reavis before the latter executed the mortgage of August 1, 1879, and that the land was included in that conveyance. In any event, the evidence is not sufficient to establish the fact that Andrew Reavis, at the time of his death, on July 22, 1886, owned land in Dixie Valley acquired by homestead entry. The land should be identified, to enable the court to determine whether or not it is involved in this action. With respect to the desert land transferred to Andrew Reavis by J. B. Reavis, the land appears to be identified; but when the title was perfected, and who purchased the land from J. B. Reavis, and the date of the purchase, are uncertain. Judge J. B. Reavis, in his deposition, says:

"I made entry of some desert sagebrush lands adjoining the Dixie Valley ranch. Having no data to refresh my memory, I am unable to state the time of entry, but I perfected title to about 240 acres of sagebrush land adjoining Dixie Valley. The arrangement relative to this land was between Andrew Reavis and myself. The latter part of 1879 it was arranged between Andrew Reavis and myself that I should execute a conveyance of this land to himself. I have since been reminded, by inspection of the instrument, that I made a conveyance to Andrew Reavis of this land in August, 1883. In September, 1886, a deed conveying the land to defendant D. M. Reavis and his son J. J. Reavis was sent to me, in this state, by D. M. Reavis, requesting that I execute the same and return it to him, and I thereupon executed the deed and returned it to him."

This evidence is not sufficient to enable the court to determine whether or not the land belonged to Andrew Reavis at the time of his death.

This view of the questions presented up to this point renders it unnecessary to enter into the discussion of the further question as to the competency of Andrew Reavis to execute the deed of January 29, 1886, whereby he conveyed all the land in controversy to David M. and James J. Reavis. I am of the opinion, however, that the incompetency of Andrew Reavis to execute that deed has not been established; and while the circumstances connected with the execution of the deed in question are such as, unexplained, would excite the gravest suspicions, nevertheless, when it is understood that Andrew Reavis

must have known at that time that he had no beneficial interest in the property, and that he was, presumably, ready to execute any instrument with respect thereto that his brother or nephew might require, his conduct under such circumstances appears rational, and the action of the other parties excusable, or at least explainable, on the ground that they were not endeavoring to take advantage of a person whose capacity might be questioned. It follows from these views that the cause of action stated in the bill has not been established, and the bill must therefore be dismissed.