## BALLEW *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF GEORGIA.

No. 547.   Argued October 28, 1895.— Decided December 16, 1895.

A certificate by the Commissioner of Pensions that an accompanying paper " is truly copied from the original in the office of the Commissioner of Pensions," taken together with a certificate signed by the Secretary of the Interior and under the seal of that Department, certifying to the official character of the Commissioner of Pensions, is a substantial compliance with the provisions of Rev. Stat. § 882, and authorizes the paper so certified to be admitted in evidence.

For the committing of the offence under Rev. Stat. § 4786, (as amended by the act of July 4, 1884, c. 181, § 4, 23 Stat. 98, 101,) of wrongfully withholding from a pensioner the whole, or any part of the pension due him, an actual withholding of the money before it reaches the hands of the pensioner is essential; and it is not enough that it is fraudulently obtained from him, after it had reached his hands; and that act does not forbid or punish the act of obtaining the money from the pensioner by a false or fraudulent pretence.

A general verdict of guilty, where the indictment charges the commission of two crimes, imports of necessity a conviction as to each; and if it

appears that there was error as to one and no error as to the other, the judgment below may be reversed here as to the first, and the cause remanded to that court with instructions to enter judgment upon the second count.

At the October term, 1893, of the Circuit Court of the United States for the Northern District of Georgia, an indictment was found against the plaintiff in error, embracing two counts, the first charging him with wrongfully withholding from a pensioner of the United States, one Lucy Burrell, part of a pension allowed and due her, and the second accusing him of demanding and receiving, as agent, a greater compensation for services in prosecuting the claim for pension than is provided by the title of the Revised Statutes pertaining to pensions.

The offences charged in the indictment are made punishable by the final paragraph of Rev. Stat. § 4786, as amended by the pension appropriation act of July 4, 1884, c. 181, § 4, 23 Stat. 98, 101.

On the trial of the case there was conflict in the testimony in many particulars as to the offence charged in the first count. The evidence tended to show that the check, issued for the payment of the pensioner, was received by the accused, a pension agent; that he went with the pensioner to a bank; that there in the presence of an officer of the bank the check was endorsed, and was presented to the paying teller, by whom the amount was paid over to or "put in the hat" of the pensioner — who was shown to be an illiterate negro woman; that, either by the suggestion of the bank officer or of the accused, the money was deposited in the bank for account of the pensioner, a deposit slip being issued therefor. The proof, moreover, was that immediately after this deposit the pensioner went to an office in the vicinity, where a check for $1887.34, one-half of the amount of the pension check, was drawn by her, she making her mark, this check being payable to the order of Hurley Ballew, a son of the accused, by whom it was immediately collected. There was conflict as to whether the accused participated in the fraud by which the drawing of the check was brought about, or whether the amount enured to

his benefit. The pensioner testified that she supposed the check was drawn for twenty-five dollars in favor of her son, while the drawee of the check, Hurley Ballew, testified that it was given him in payment for an insignificant service rendered in connection with the procuring of testimony during the prosecution of the claim for the pension. There was testimony on the second count tending to support the same, although as to this count there was also a conflict in the evidence.

During the course of the trial a page from the records of the Pension Office, showing the issue of the pension to the pensioner named in the indictment, was offered and admitted in evidence over the objection of the accused, to which action of the court exception was duly reserved.

One J. B. Chamblee was examined as a witness for the defendant, and exception was reserved to the exclusion of testimony given on his redirect examination. At the close of the evidence the following instruction was requested by counsel for the accused, which was refused and exception noted.

" When a pension check is delivered to a pensioner, and she takes the same to a bank and has it cashed, and then deposits the said fund in a bank and takes a deposit slip therefor, the fund loses its nature and character as pension money, and the ordinary relation of debtor and creditor exists between the pensioner and the bank, and if thereafter, by any device or in any way whatever, the pension attorney obtains a draft from her and draws it out of her general account, he cannot be convicted of withholding under section 5485 of the Revised Statutes, and it would be your duty to acquit him on that count, if these be the facts as to that branch of the case."

The giving of the following as part of the charge of the court was also excepted to by defendant :

" Now, the defence here is that the amount of the check received from Mr. Rule, the pension agent, really went into the possession of the pensioner in this case, and the contention for the government is that under the facts of the case the money really did not go into her possession in contemplation of law, and they also contend that the attorney, the de-

fendant in this case, could not withhold the money or any part of it by getting the check, which is in evidence here, for eighteen hundred and odd dollars.

"Upon that branch of the case I instruct you thus: If you believe that the receipt of the pension check under all the circumstances connected with it, and the possession of the pension check by the defendant in this case, and the taking of the check to the bank and his accompanying the pensioner to the bank, the turning of the check into cash and the payment of money to her, the physical possession placed in her by putting the money in her hat, the deposit of the money in the bank, and the taking of the pensioner to the office of the defendant and the drawing of the check for eighteen hundred dollars; if you believe that this was all one transaction arranged and designed by the defendant in this case for the purpose of getting into his possession eighteen hundred dollars of the money which the pensioner received; that it was a scheme designed by him, one continuous transaction, for that purpose, and that he was a party to it and was the beneficiary of the money received, then that would be in law a withholding of the money under this statute, and the defendant would be guilty, and it would be your duty to convict him; but it would be necessary for you to believe that. The other rule which I gave you is true and exists in law, that is, that the money can be paid by their attorney to the pensioner, and thereafter there might be a transaction between them which, of course, would be entirely legal and honest, by which the cash could pass from the pensioner to the attorney, but that would depend on the character of the transaction. The jury will see the facts, and I state it to you again, that if all these facts or series of facts are one continuous transaction designed by the defendant and arranged by him, as contended by the government, for the purpose of getting into his possession eighteen hundred and odd dollars of the money of the pensioner, and that he did receive it or was the beneficiary of the receipt of it, then that would be withholding in the meaning of the statute. Now, the facts in this case are for the jury to determine. The check signed by the pensioner, which

seems to be made to Hurley Ballew and endorsed by him, is in evidence and you will have that out with you."

The court instructed the jury that if they considered the defendant guilty on one count and innocent on the other, they should so find; and if they found him guilty on both counts, that they should return a general verdict of guilty. This last was the verdict returned. After an ineffectual effort for a new trial, the case was brought here on error.

*Mr. W. C. Glenn,* (with whom was *Mr. Daniel W. Rountree* on the brief,) for plaintiff in error.

*Mr. Assistant Attorney General Whitney* for defendant in error.

Mr. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

The assignments of error address themselves to four rulings of the court, the one admitting in evidence the pension certificate and the other excluding certain testimony, and two to the refusal to give the instruction requested, as well as to the error alleged in the instruction given.

The ground of objection relied upon as to the record from the Pension Office is that the copy was improperly authenticated, because the certificate signed by the acting Secretary of the Interior, and under the seal of the department, referred only to the official character of the Commissioner of Pensions, and the faith and credit to which his attestations were entitled, and Rev. Stat. § 882 is cited in support of the contention. That section reads as follows:

"Copies of any books, records, papers, or documents in any of the Executive Departments, authenticated under the seals of such Departments, respectively, shall be admitted in evidence equally with the originals thereof."

By reference to the transcript in question in the record, we find that the certificate of the acting Secretary of the Interior was preceded by a certificate signed "Wm. Lochren, Commissioner of Pensions," certifying that "the accompanying page,

numbered 1, is truly copied from the original in the office of the Commissioner of Pensions." The records of the Pension Office constitute part of the records of the Department of the Interior, of which Executive Department the Pension Office is but a constituent. We think that the certificates in question, taken together, were a substantial compliance with the statute.

The exception taken to the ruling out of certain answers made by Chamblee, one of defendant's witnesses, on his redirect examination, results from the following facts: The witness upon his examination in chief testified solely with reference to the circumstances connected with the giving by the pensioner of the check of $1887.34, which formed the basis of the charge of withholding covered by the first count in the indictment. The cross examination was confined to the same subject. At the close of the cross examination the witness stated that he had been asked by a special examiner of pensions, who was investigating the matter, what he knew about the consideration of the check in question. The witness further said that A. W. Ballew came and asked him if he had been interviewed by the examiner, to which inquiry of Ballew the witness stated he had answered yes, and had informed Ballew that the examiner had questioned him about the eighteen hundred dollar check, and that he told him that he thought the check had been given for a house and lot. The witness next stated that Mr. Ballew then told him that the pensioner had given the check to Hurley Ballew.

Upon redirect examination he testified as follows:

" Q. In that conversation with A. W. Ballew, the defendant here, what did he say was the basis of that money given to Hurley Ballew?

" A. What did A. W. Ballew say he done as a matter of inducement to her?

" Q. Yes.

" A. I don't know anything, only that he prosecuted this pension claim, and as to what he had to do with Hurley I don't know that he ever said anything. I think he told me he got his fee from the pension department as attorney.

" Q.  That is all he ever got ?

" A.  That is all he got, I think he told me.

" Q.  That he got his fee from the pension department ?

" A.  That is all he ever got."

Objection being interposed by the district attorney to proof of Ballew's declarations, the objection was sustained and the testimony excluded from the consideration of the jury.

The ground upon which counsel for plaintiff in error rests his claim of admissibility is that when a confession is put in evidence by the prosecution, it is the right of the accused to demand that all of the conversation in which the alleged confession was made should be received.   We are unable to reach the conclusion that Ballew's mere statement to a witness, that the pensioner had given his son the check, was a confession, or in the nature of a confession.   It had no tendency to establish his guilt or to operate to his prejudice, and confessions are only admitted as being statements against the interest of the party by whom they are claimed to have been made.   But the reëxamination of the witness was not directed to the ascertainment of what other statements had been made in the conversation upon the subject about which he had testified on his cross-examination, to wit, the check to Hurley Ballew, but to the drawing out of new matter, not connected with the subject to which the cross-examination related.   This was clearly improper.   1 Greenleaf on Evidence, § 467, and cases cited.   See, also, cases cited in note *a* to *Ibid.*   15th ed. § 201, and *People* v. *Beach*, 87 N. Y. 508, 512.

The statute upon which the first count is based reads as follows :

" Any agent or attorney or other person instrumental in prosecuting any claim for pension or bounty land, who shall directly or indirectly contract for, demand, or receive, or retain any greater compensation for his services or instrumentality in prosecuting a claim for pension or bounty land than is herein provided, or for payment thereof at any other time or in any other manner than is herein provided, or who shall wrongfully withhold from a pensioner or claimant the whole or any part of the pension or claim allowed and due such pen-

sioner or claimant, or the land warrant issued to any such claimant, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall for every such offence be fined not exceeding five hundred dollars, or imprisonment at hard labor not exceeding two years, or both, in the discretion of the court."

The refusal of the court to give the charge asked, and the charge by it given, proceeded upon the theory that although pension money was actually paid over to the pensioner and by her deposited in bank, the obtaining thereafter of such money from the pensioner constituted a withholding under the statute just quoted. The word "withholding" has a definite signification, and we think contemplates, as used in the statute under consideration, not the fraudulent obtaining of money from a pensioner, but the withholding of the money before it reaches the hands of the pensioner and passes under his dominion and absolute control. The context of the statute supports this view, for its penalty is imposed for the wrongful withholding of the whole or any part of the pension claim allowed and due such pensioner, and not for a wrongful obtaining of the same. The fact that the offence of withholding is limited to any agent or attorney or other person instrumental in prosecuting any claim for pension demonstrates that Congress intended to legislate merely against the wrongful withholding by certain individuals, who, by reason of their relation to the pensioner and his claim, might lawfully obtain possession of the same from the government, and upon whom rested the duty of paying it over to the pensioner. If withholding had been considered as applicable to the retaining of pension money obtained from the pensioner by false pretences, the limitation as to particular persons would not have been enacted. Indeed, to construe the word "withholding" as relating to money received from a pensioner, not only reads the word "due" out of the statute, but also leads to the inevitable conclusion that Congress, whilst intending to make it an offence to obtain from a pensioner pension money by false pretences, has yet confined the offence to particular individuals, and permitted all others to commit with impunity the crime it was intended to punish. It also follows if the

statute be construed as embracing money obtained from a pensioner by false pretence, that the act forbids withholding money thus obtained, but does not forbid or punish the act of obtaining the money by a false or fraudulent pretence. These reasons make it clear that the purpose of the statute in punishing a withholding by certain persons standing in a fiduciary relation to the pensioner is consistent only with the theory that Congress was legislating to prevent an embezzlement of pension money, not a larceny thereof from the pensioner or the obtaining of the same from him by false pretences. This construction of the statute is further supported by reference to the act of March 3, 1873, c. 234, 17 Stat. 566, in § 31 (p. 575) of which is contained the original provision making it an offence to withhold pension money. In juxtaposition to that section, in section 32, was the following:

"Any person acting as attorney to receive and receipt for money for and in behalf of any person entitled to a pension shall, before receiving said money, take and subscribe an oath, to be filed with the pension agent, and by him to be transmitted, with the vouchers now required by law, to the proper accounting officer of the treasury that he has no interest in said money by any pledge, mortgage, sale, assignment, or transfer, and that he does not know or believe that the same has been so disposed of to any person."

The portion of section 32, above quoted, was subsequently embodied in section 4745 of the Revised Statutes.

The signification which we affix to the word "withholding" is also shown to be the one intended by Congress, by the previous portion of the paragraph of the act of 1884, which not only makes it an offence to directly or indirectly contract for, demand, or receive, or retain any greater compensation for services, or for instrumentality in prosecuting a pension claim than allowed by the act, but specifically inhibits the obtaining of payment thereof "at any other time or in any other manner" than as provided in the act, thus making it clear that where it was intended to punish the offence of receiving an illegal fee as well after the payment of the pension to the pensioner as before the receipt by him of the money, the in-

tention was unequivocally conveyed. The clause "payment thereof at any other time or in any other manner than is herein provided" was not contained in the act of 1873, nor in section 5485 of the Revised Statutes, but was first embodied in the act of 1884, whereas the provision as to withholding of a pension has always been confined to the withholding of a pension "due" the pensioner. In the very next sentence of the act of 1873, following the designation of the offence of withholding, there is a provision affixing a penalty to the offence of embezzlement of pension money by a guardian from his ward. This latter offence is now embodied in Revised Statutes, section 4783, which reads as follows:

"Every guardian having the charge and custody of the pension of his ward who embezzles the same in violation of his trust, or fraudulently converts the same to his own use, shall be punished by fine not exceeding two thousand dollars or imprisonment at hard labor for a term not exceeding five years, or both."

It may be remarked, in passing, that it would be as reasonable to argue that one who had fully accounted as guardian and paid over to his ward the balance due, when the ward had attained his or her majority, could be prosecuted under section 4783, if, after such accounting and payment, he fraudulently obtained money from his former ward which might from the proof appear to be a portion of the balance so paid on the accounting, as to contend that when a pension, allowed and due from the government, had been paid to the pensioner, it continued to be "due," in any money transaction between the pensioner or his former agent or attorney.

The instruction given by the trial court that there was a withholding under the statute if the transaction in this case was a continuous scheme designed by the accused for the purpose of getting into his possession a portion of the pension money, made his guilt or innocence depend, not alone upon whether there was a withholding in the statutory sense of the word, but on whether there was a scheme to defraud. It was tantamount to instructing the jury that they should convict even though they were satisfied that the money had not

been withheld, if they believed that before payment over a scheme to defraud had arisen which was carried out after the pensioner had received the amount of the pension, and after it had been by her deposited in bank, and had created between her and the bank the legal relation of debtor and creditor. *Scammon* v. *Kimball*, 92 U. S. 362, 369–370; *Florence Mining Co.* v. *Brown*, 124 U. S. 385, 391. Of course, if the indictment had been so framed as to bring the facts, which it alleged constituted a withholding, within the reach of the first clause of the statute, which forbids the taking of illegal compensation, the instruction given by the court would have been sound. In that case, the taking of the money is made criminal, whether done before payment to the pensioner, at the time of such payment, or at any other time; withholding, on the contrary, is confined to money due, which, in no sense, embraces that which has been actually paid over to a pensioner and has passed under his complete control. However much pension money, even when taken into the possession of a pensioner, may retain its identity for certain purposes, we do not think, for the reasons just stated, that this instruction given was sound in law. The elementary rule is that penal statutes must be strictly construed, and it is essential that the crime punished must be plainly and unmistakably within the statute. *United States* v. *Brewer*, 139 U. S. 278. It follows, therefore, that the instruction asked was wrongfully refused and the instruction given was erroneous, and that there was error in the conviction as to the first count in the indictment.

The verdict was a general verdict. That in a case such as this a general verdict is proper and imports of necessity a conviction as to both crimes, is settled. *Claassen* v. *United States*, 142 U. S. 140, 146. It follows, then, that though there was error as to the conviction of one of the offences charged, there was no error in the conviction upon the other. The question, therefore, arises whether error as to one only of the counts must lead to reversal of the conviction on that count alone or to like reversal as to the count where no error exists; in other words, whether, after reversing the judgment, which was on both counts, we can annul the verdict upon the first

count alone, and leave the verdict to stand as to the second count unaffected by the reversal.

It was held in England that at common law a reviewing court upon a writ of error in a criminal case had not the power, upon a reversal, to enter a proper judgment or to remand the cause for that purpose. *In re Frederich*, 149 U. S. 70, 74, citing *Rex* v. *Bourne*, 7 Ad. & El. 58. This conclusion rested upon the theory that a court of error was confined exclusively to the determination whether error existed, and if it found that it did, its duty was to reverse and discharge the prisoner. In *Holloway* v. *Queen*, 17 Q. B. 317, 328, it was held that since the passage of the act of 11 & 12 Vict. c. 78, § 5, the English courts possessed ample power upon the reversal of a judgment to remand the case for a proper judgment. The act referred to provided as follows:

" That whenever any writ of error shall be brought upon any judgment on any indictment, information, presentment, or inquisition in any criminal case, and the court of error shall reverse the judgment, it shall be competent for such court of error either to pronounce the proper judgment or to remit the record to the court below, in order that such court may pronounce the proper judgment upon such indictment, information, presentment, or inquisition."

In order to save all doubt on the subject, so also in the several States statutes have been adopted expressly conferring upon reviewing courts authority upon reversal to remand the cause to the lower court with such directions for further proceedings as would promote substantial justice.

The statutes in reference to the power of Federal appellate tribunals have from the beginning dealt with the subject.

By the judiciary act of September 24, 1789, c. 20, 1 Stat. 73, 85, it was provided in § 24 " that when a judgment or decree shall be reversed in a Circuit Court, such court shall proceed to render such judgment or pass such decree as the District Court should have rendered or passed, and the Supreme Court shall do the same on reversals therein, except where the reversal is in favor of the plaintiff or petitioner in the original suit, and the damages to be assessed, or matter to be decreed,

are uncertain, in which case they shall remand the cause for a final decision."

By § 25 of the same act, this court was given power on writs of error to the state courts to reëxamine, reverse, or affirm their final judgments "in the same manner and under the same regulations, and the writ shall have the same effect as if the judgment or decree complained of had been rendered or passed in a Circuit Court, and the proceeding upon the reversal shall also be the same, except that the Supreme Court, instead of remanding the cause for a final decision, . . . may, at their discretion, if the cause shall have been once remanded before, proceed to a final decision of the same, and award execution."

Under the power thus conferred it has never been questioned that this court possessed authority upon reversal for error of a final judgment to award a new trial. The recognition of this right involves necessarily a denial of the principle upon which the case of *Rex* v. *Bourne* proceeded. As we have seen, the postulate upon which that case rested was the absence of power to render such judgment or order as the ends of justice might require, because of the want of authority to do anything else but determine the existence of the error complained of. It is clear that by section 24 of the judiciary act of 1789, power was conferred upon the Circuit Courts when reviewing the judgments or decrees of District Courts to render such judgment or pass such decree as the District Court should have rendered or passed, and that upon this court was conferred the same power. True, at the time the judiciary act was passed no jurisdiction to review final judgments in criminal cases was vested in Circuit Courts or in this court, except in cases of error to courts of last resort of a State, but as the power on writs of error to state courts embraced criminal cases, it could not have been contemplated that the general grant of authority on such writs to render the judgment required by the justice of the case was restricted to civil cases alone. The subsequent statutes add cogency to the view that this was not contemplated.

The second section of the act of June 1, 1872, c. 255, 17

Stat. 196, provided that the appellate court (referring to this court and Circuit Courts) may affirm, modify, or reverse the judgment, decree, or order brought before it for review, or may direct such judgment, decree, or order to be rendered, or such further proceedings to be had by the inferior court as the justice of the case may require.

The subsequent embodiment of the provision just quoted in section 701 of the Revised Statutes makes clear the fact that Congress in conferring the power to review on error did not intend that the power, on reversal, to make such order as was called for by the nature of the error found to exist, should be limited to civil cases.   Section 701 reads as follows:

" The Supreme Court may affirm, modify, or reverse any judgment, decree, or order of a Circuit Court, or District Court acting as a Circuit Court, or of a District Court in prize causes, lawfully brought before it for review, or may direct such judgment, decree, or order to be rendered, or such further proceedings to be had by the inferior court as the justice of the case may require."

The reënactment of the provisions as to writs of error to the highest court of a State, contained in § 709 of the Revised Statutes, manifests the purpose to continue in force the power in such cases to render the judgment required by the ends of justice.   The language of the statute is that on such writs the judgment of the state court —

" May be reëxamined and reversed or affirmed in the Supreme Court upon a writ of error.   The writ shall have the same effect as if the judgment or decree complained of had been rendered or passed in a court of the United States.

" The Supreme Court may reverse, modify, or affirm the judgment or decree of such state court, and may, at their discretion, award execution, or remand the same to the court from which it was removed by the writ."

By the act of March 3, 1879, c. 176, 20 Stat. 354, jurisdiction was conferred in certain criminal cases upon Circuit Courts to review judgments of the District Courts, and it was provided in § 3 that "in case of an affirmance of the judgment of the District Court, the Circuit Court shall pro-

ceed to pronounce final sentence and to award execution thereon; but if such judgment shall be reversed, the Circuit Court may proceed with the trial of said cause *de novo* or remand the same to the District Court for further proceedings."

The act of February 6, 1889, c. 113, 25 Stat. 655, which gave jurisdiction to this court by writ of error in all capital cases, tried before any court of the United States, provided that the final judgment of such court against the respondent, upon the application of the respondent, should be reëxamined, reversed, or affirmed, upon writ of error, under such rules and regulation as this court might prescribe. And the act further declared (§ 6):

"When any such judgment shall be either reversed or affirmed the cause shall be remanded to the court from whence it came for further proceedings in accordance with the decision of the Supreme Court, and the court to which such cause is so remanded shall have power to cause such judgment of the Supreme Court to be carried into execution."

By the act of March 3, 1891, c. 517, 26 Stat. 826, jurisdiction was conferred upon this court "in cases of conviction of a capital or otherwise infamous crime;" and jurisdiction was conferred in other criminal cases upon the Circuit Courts of Appeal established by that act.

With reference to the newly established courts in section 11 of the act it was provided as follows:

"And all provisions of law now in force regulating the methods and system of review through appeals or writs of error shall regulate the methods and system of appeals and writs of error provided for in this act in respect of the Circuit Courts of Appeals, including all provisions for bonds or other securities to be required and taken on such appeals and writs of error."

It thus conclusively appears that the authority of this court to reverse, and remand with directions to render such proper judgment as the case might require, upon writs of error in criminal cases, to state courts and to the Circuit Courts in capital cases, was confessedly conferred by express statutory

provisions, and that a like power was conferred upon the Circuit Courts of Appeals and Circuit Courts in cases where they · exercised jurisdiction by error in criminal cases over the District Court.

From this and from a review of the legislation on the subject of the powers conferred upon this court as a reviewing court, it follows as a necessary conclusion that general authority was given to it on writ of error to take such action as the ends of justice, not only in civil but in criminal cases, might require. To contend otherwise presupposes that Congress had conferred this power upon this court on writs of error to state courts, on writs of error to the Circuit Courts in capital cases, and had also conferred like power upon Circuit Courts and the Circuit Courts of Appeals, and yet had denied it to this court in a class of criminal cases where jurisdiction was conferred by writ of error under the act of 1891. To so conclude would work out an absurdity, and would destroy the unity of the Federal judicial system. The contrary conclusion finds support only in the contention that because in each concession of jurisdiction, by writ of error, there was not a reëxpression of the general method by which such writ should be exercised, therefore the grant of power was divested of its efficacy. But this is fully answered by the entire history of the legislation which demonstrates that the general grant of power to render a proper judgment on writs of error was evidently not reiterated in express terms when new subjects-matter of jurisdiction were vested in this court, because such authority was deemed to be already adequately provided by the general statutes on the subject. For this reason, in speaking of the act of 1891, this court said, in *Hudson* v. *Parker*, 156 U. S. 277, 282: "As to the methods and system of review, through appeals or writs of error, including the citations, supersedeas, and bond or other security, in cases, either civil or criminal, brought to this court from the Circuit Court or the District Court, Congress made no provision in this act, evidently considering those matters to be covered and regulated by the provisions of earlier statutes forming parts of one system."

In *In re Bonner*, 151 U. S. 242, 262, we held that an error

in a sentence did not vitiate a verdict, and that this court, sitting in *habeas corpus*, might remand for resentence one whose conviction was lawful but against whom a judgment, erroneous in part, had been rendered. In this case, as the only errors found in the record relate to and affect the crime covered by the first count, substantial justice requires, and it is so ordered, that the general judgment rendered by the court below should be

> *Reversed and the cause be remanded to that court with instructions to enter judgment upon the second count of the indictment, and for such proceedings with reference to the first count as may be in conformity to law.*