## JOHNSON v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. April 14, 1914. On Rehearing, June 9, 1914.)

### No. 2017.

1. PROSTITUTION (§ 4*)—WHITE SLAVE ACT—EVIDENCE.

In a prosecution for violating the White Slave Act (Act June 25, 1910, c. 395, 36 Stat. 825 [U. S. Comp. St. Supp. 1911, p. 1343]), evidence *held* sufficient to sustain a conviction of accused for causing a woman to be transported, in interstate commerce, for the purpose of having sexual intercourse with her, but insufficient to sustain counts for causing the same woman to be transported for purposes of prostitution.

[Ed. Note.—For other cases, see Prostitution, Cent. Dig. § 4; Dec. Dig. § 4.*]

2. STATUTES (§ 217*)—CONSTRUCTION—EXTRANEOUS REFERENCES.

In the absence of ambiguity apparent on the face of the statute, extraneous references to public debates, as indicating the author's intent in the introduction of a statute, are inadmissible and cannot be considered,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

but the meaning is to be determined exclusively from the text, with the words taken in their ordinary and usual meanings.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 293; Dec. Dig. § 217.*]

3. PROSTITUTION (§ 1*) — WHITE SLAVE ACT — "PROSTITUTION" — "OTHER IM-MORAL PURPOSE."

The White Slave Act makes it a felony for any one knowingly to transport, or cause to be transported or aid or assist in obtaining transportation for, or in transporting in interstate or foreign commerce, any woman or girl for the purpose of prostitution or debauchery, or any other immoral purpose. *Held*, that while the term "prostitution" involves the financial element and signifies commercialized vice, the words "other immoral purpose" as used in the statute are not limited to kindred offenses involving the sharing of profits by the hire of the woman's body, and hence their meaning was fulfilled by sexual debauchery between the female and the defendant involving no financial element.

[Ed. Note.—For other cases, see Prostitution, Cent. Dig. §§ 1, 2; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 6, pp. 5740, 5741.]

4. COMMERCE (§ 16*) — WHITE SLAVE ACT — POWER OF CONGRESS — COMMERCE CLAUSE.

Since the term "commerce" as used in the federal Constitution (article 1, § 8, cl. 3) granting to Congress the right to legislate with reference to interstate and foreign commerce, is not limited to traffic in or an exchange of commodities, but extends as well to the transportation of persons, and includes navigation and intercourse, giving to Congress not only the right to regulate, but actually to prohibit transportation in the interest of the general welfare, Congress had complete power to pass the White Slave Traffic Act, making it a felony to transport or cause to be transported any woman or girl for prostitution, or any other immoral purpose, though the statute be construed as extending beyond commercialized vice to include transportation in interstate commerce of a female for the purpose of mere unlawful sexual intercourse with defendant.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 2; Dec. Dig. § 16.*

For other definitions, see Words and Phrases, vol. 2, pp. 1287–1298; vol. 8, pp. 7606, 7607.]

5. CRIMINAL LAW (§ 84*)—PLACE OF TRIAL—WHITE SLAVE ACT.

Since the violation of the White Slave Act is an abuse of interstate transportation, Congress was entitled to provide, as it did, that the offense should be cognizable in any district from, through, or into which the transportation led.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 115–124; Dec. Dig. § 84.*]

#### On Rehearing.

6. CRIMINAL LAW (§ 703*)—DUTY OF DISTRICT ATTORNEY.

Where the District Attorney, in a prosecution for violating the White Slave Act, in good faith stated to the jury that one of defendant's purposes in transporting the female in question was to compel her to commit the crime against nature upon his body, but the attorney subsequently discovered that he could not prove such statement, it was his duty at once to withdraw the same.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1059; Dec. Dig. § 703.*]

7. WITNESSES (§ 401*)—CROSS-EXAMINATION—CONCLUSIVENESS OF ANSWER—COLLATERAL MATTERS.

Where, in a prosecution for violating the White Slave Act, defendant testified in his own behalf, and on cross-examination was asked if he

had not beaten a certain woman with his fist, and answered in the negative, the government could not introduce evidence to show the contrary, under the rule that a cross-examiner, to show the character of the party from his own admission, may go into collateral matters, but he is bound by the answers he obtains.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 1270; Dec. Dig. § 401.*]

8. CRIMINAL LAW (§ 878*)—SEPARATE COUNTS—PARTIAL INVALIDITY.

The rule that if a criminal act is charged in several ways, and sentences run concurrently, one good count, supported by competent evidence, will sustain a general verdict of guilty does not apply, where the elements involved in the two sets of counts are not identical, and the trial judge in fact assessed the punishment on the basis that defendant was guilty of both offenses.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2098–2101; Dec. Dig. § 878.*]

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois; George A. Carpenter, Judge.

John Arthur Johnson was convicted of violating the White Slave Act, and he brings error. Reversed for resentence on the sexual intercourse count, and for retrial on the prostitution count.

Benjamin C. Bachrach, of Chicago, Ill., for plaintiff in error.

James H. Wilkerson and Harry A. Parkin, both of Chicago, Ill., for the United States.

Before BAKER, KOHLSAAT, and MACK, Circuit Judges.

BAKER, Circuit Judge. Plaintiff in error, defendant below, was convicted of violating the White Slave Traffic Act, which makes it a felony for any one knowingly to—

"transport or cause to be transported, or aid or assist in obtaining transportation for, or in transporting, in interstate or foreign commerce, any woman or girl for the purpose of prostitution or debauchery or any other immoral purpose."

One group of counts on which defendant was held charged that he procured the transportation of a girl from Pittsburgh to Chicago for the immoral purpose of having sexual intercourse with her. In another group the purpose laid was prostitution.

[1] Respecting the first group the evidence showed: That the girl, in financial straits at Pittsburgh, endeavored to reach defendant by long-distance telephone. That an employé of defendant answered, and to him she told her plight. That the next day she received a telegram, signed "Jack," asking what she needed for expenses. That in reply to her answer she received a telegram reading: "I am sending you $75. Go to Chicago at Graham's and wait until I get there. Jack." That she drew the $75 from the Postal Telegraph Company, purchased therefrom a ticket to Chicago, and traveled to that city on the Pennsylvania Railroad, and that defendant shortly thereafter had sexual intercourse with this girl in Chicago.

No direct evidence was adduced to establish the authenticity of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

telegrams. But from defendant's statement on the witness stand that he would not say that he had or had not sent them, from the fact that defendant on his arrival in Chicago called the girl by telephone at Graham's, and from the fact as testified to by the girl that defendant at their first meeting inquired, "Did you receive the $75 I sent you?" the jury were warranted in finding that defendant was the author of the messages and the furnisher of the money for the girl's transportation.

On the evidence thus far cited, a suspicion might be entertained that the purpose of the transportation was sexual intercourse. This evidence also is consistent with the theory that defendant had no sexual intent at the time he aided the girl in her travels. And the presumption of innocence would require the adoption of this theory if here the evidence stopped. But the record further establishes that before aiding this girl defendant habitually indulged in promiscuous sexual intercourse; that this girl was a prostitute; that defendant first met her several years before in a brothel; that throughout the period of their acquaintance they maintained sexual relations; and that frequently defendant in his journeys about the country took the girl with him, or had her travel to meet him, and always for the purpose of sexual intercourse. This additional evidence furnished a basis from which the jury could justifiably draw the inference of fact that when defendant furnished the transportation he did so for the purpose of having sexual intercourse with the girl after their arrival in Chicago, just as a jury may reject a defendant's protestation of innocence in passing counterfeit when the evidence shows that prior to the act in question he had habitually or frequently passed other similar counterfeits.

But a different situation affects the prostitution counts. Telephone and telegraph messages contained no suggestion of prostitution. The only fact is that several days after the girl's arrival in Chicago defendant supplied the money to enable her to open and conduct a brothel. This fact might lead to a suspicion that defendant when providing transportation had the intent to aid her subsequently in her profession. But criminal convictions cannot be allowed to rest on suspicion. And there were no supplementary facts like those that support the sexual intercourse counts—no proof that defendant had ever been connected with or interested in brothels, or that prior to the act in Chicago he had ever aided this or any other girl to engage in prostitution.

[2] Against upholding the conviction on the sexual intercourse counts defendant's first insistence is that the intention of Congress was otherwise. By noting current history we may be aware that the act, when applied to merely unlawful sexual intercourse, has been used as an instrument for blackmail or other oppressions; but that has. nothing to do with a judicial ascertainment of the meaning and constitutionality of the act when it was adopted. Reference is made to public debates as indicative of the author's intent. But the writer of a bill may explain his purpose to his fellow members, and they may vote for it solely because in their judgment it has a wider or narrower

scope than he states. This is one of the considerations that ages ago led to the adoption of the universal primary canon of interpretation that in the absence of ambiguity apparent upon the face of a document extraneous references are not permissible, and the meaning is to be gathered exclusively from the text with the words taken in their ordinary and usual meanings.

[3] A further urge is that the words "prostitution or debauchery or other immoral purpose" do not cover sexual intercourse that is merely unlawful. "Other immoral purpose" are words of such generality that a criminal conviction thereunder could not be tolerated for acts whose purpose was any and every sort of immorality. They must be limited to that genus of which the preceding descriptions are species. Defendant contends that the nexus, the attribute in common, is "commercialized vice"; that a defendant cannot be guilty unless it be shown that he is fiancially concerned in "the traffic in women." Prostitution, the first species, involves the financial element. But there is no condition in the statute that the furnisher of transportation shall be guiltless unless he shares in or somehow profits by the hire of the woman's body. And in Hoke's Case, 227 U. S. 308, 33 Sup. Ct. 281, 57 L. Ed. 523; 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905, a conviction for transporting a woman "for the purpose of prostitution" was upheld without proof that the woman was a "white slave," an article of barter in "the traffic in women," or that the defendant was interested in her earnings. Debauchery, the other named species, is restricted by its association with the first species to sexual debauchery, a leading of a chaste girl into unchastity. No financial element is necessarily involved in sexual debauchery; the statute introduces no such condition; and Athanasaw's Case, 227 U. S. 326, 33 Sup. Ct. 285, 57 L. Ed. 528, Ann. Cas. 1913E, 911, teaches that the providing of interstate transportation for the mere purpose of attempting to lead a chaste girl into unchastity is a felony without proof that the defendant intended to be the debaucher, or that he expected to profit by the girl's hire if she should become a prostitute. So it becomes apparent that "commercialized vice" or "the traffic in women for gain" is not the common ground, that the nexus indicative of the genus is sexual immorality, and that fornication and adultery are species of that genus. This conclusion is fortified by United States v. Bitty, 208 U. S. 393, 28 Sup. Ct. 396, 52 L. Ed. 543, where in construing the prohibition of the immigration act against the importation of alien women "for the purpose of prostitution or any other immoral purpose," the latter phrase was held to mean unlawful sexual intercourse regardless of financial considerations. See, also, United States v. Flaspoller (D. C.) 205 Fed. 1006, in reference to the White Slave Traffic Act.

[4] Lawful power in Congress to pass an act of this scope is challenged. There was a time when it would have been interesting to examine the contention that the word "commerce" in the commerce clause of the Constitution means only "traffic in or an exchange of commodities." But when the ultimate tribunal long ago definitely decided that the term also includes "navigation and intercourse," that "transportation of persons" in and of itself is "commerce," and that

"commerce" may not only be "regulated," but actually prohibited, in the interest of the general welfare, no room was left for profitable discussion. Passenger Cases, 7 How. 283, 12 L. Ed. 702; Gloucester Ferry Case, 114 U. S. 196, 5 Sup. Ct. 826, 29 L. Ed. 158; Rahrer's Case, 140 U. S. 545, 11 Sup. Ct. 865, 35 L. Ed. 572; Covington Bridge Case, 154 U. S. 204, 14 Sup. Ct. 1087, 38 L. Ed. 962; Addyston Pipe Case, 175 U. S. 226, 20 Sup. Ct. 96, 44 L. Ed. 136; Lottery Case, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492; Hoke's and Athanasaw's Cases, supra. Whole ranges of acts, like those regulating carriers, safety appliances, employers' liability for injuries to interstate trainmen, hours of dispatchers' work, 28-hour confinement of live stock, movements of diseased persons or animals, pure food, etc., are upheld only on the basis that "transportation is commerce." Nothing remains but to say that the present act obviously is concerned with the interstate transportation of persons. How far and with what governmental purposes the undoubted power shall be exercised must be determined by the legislative, not the judicial, department of government.

[5] Defendant questions the right of the government to try him in the Northern District of Illinois. But inasmuch as the trial is for an abuse of interstate transportation, we are of the opinion that Congress had a clear right to provide, as it did, that the offense should be cognizable in any district from, through, or into which the transportation led.

Minor objections to the course of the trial have been brought to our attention. Suffice it to say that we have carefully examined the entire record and find nothing substantial of which defendant may justifiably complain except the submission of the prostitution counts.

Inasmuch as the sentence is based on the two sets of counts jointly, the judgment is reversed for resentence on the sexual intercourse counts and for retrial of the prostitution counts if the government has additional evidence to support them.

On Rehearing.

Before BAKER, SEAMAN, and MACK, Circuit Judges.

BAKER, Circuit Judge. In its petition for rehearing the government calls attention to an overlooked item of evidence to support the submission of the prostitution counts. Not only was the state of the evidence as given in the opinion unquestioned in the government's briefs and at the oral argument, but the position was taken that the prostitution counts were sufficiently sustained by proof that the prosecuting witness was a confirmed prostitute, and that defendant had sexual intercourse with her. We held and now hold that this position is unsound. The unlawful intercourse feature of the statute can be established only by evidence that transportation was furnished for the purpose of enabling the defendant to have sexual intercourse with the woman or girl, and whether she was previously moral or immoral is immaterial. The prostitution feature of the statute can be established only by evidence that the transportation was furnished for the purpose of the defendant's aiding or abetting the woman or girl in submitting

her body promiscuously for hire, and whether the defendant himself had sexual intercourse with her or not is immaterial.

In the testimony of the prosecuting witness appears an account of a trip from Pittsburgh to Atlantic City, to Chicago, to Cleveland, to Detroit, to Buffalo, to Toronto, to Montreal, and back to Pittsburgh. For each move the transportation was furnished by defendant, and at each place the unlawful relations were maintained. This testimony was taken by us as supportive only of the unlawful sexual intercourse counts, and our attention was not attracted to a conversation at Atlantic City, which occurred about 2½ months prior to the transportation counted on in the indictment, and which may be given an interpretation bearing on the prostitution counts. She testified that defendant there said to her that if she was sporting she might as well make the money for herself as for others, and that she should look for an apartment at Chicago; that at Chicago she looked for an apartment, but failed to find one; that defendant paid her way to Chicago, and there maintained the same relations with her as at the other cities. Whether her statement of defendant's remark should be accepted over defendant's denial, whether the remark should be considered as merely casual advice for her independent action, or as evidencing an intent to aid or abet her in prostitution, whether the furnishing of transportation from Atlantic City to Chicago was for purposes of unlawful sexual intercourse, or for prostitution, or for both, we recognize as questions for the jury. But the contrast between the states of the evidence in support of the two sets of counts is very marked. Against conviction on the sexual intercourse counts defendant's main reliance was on points of law, which we denied. The evidence was overwhelming. And we continue to believe that we were right in upholding the conviction on those counts against complaints of acts by the government's attorney and erroneous admission of evidence, because the record demonstrates that, no matter how improperly the prejudices of jurors may have been aroused, no other verdict could properly have been reached. But the evidence tending to support the prostitution counts is so slight and dubious that, when we see that these counts were carried along by the clearly established sexual intercourse counts, we are of opinion that the matters above referred to become material.

[6] In his opening statement the government's attorney said:

"Another immoral purpose is one too obscene to mention, the purpose being for defendant to compel these women to commit the crime against nature upon his body. We will demonstrate that beyond any reasonable doubt to you, gentlemen, before the close of this case."

We must assume that the government's attorney, when he made the statement, believed he could produce the evidence. But at some time before he closed he knew that the picture he had drawn of the negro pugilist could not be verified. Yet not until after defendant's attorney had made a motion to that effect after the close of the government's case were the crime against nature counts withdrawn from the consideration of the jury. A desire, if not a duty, to be fair should have led the government's attorney to withdraw that heinous charge the moment he knew it could not be substantiated.

Similarly with respect to the unsupported statement:

"It will further appear that from time to time as he had the three women with him about the country, because of their differences and other reasons, he would drop one of them off and put her into a sporting house temporarily, to relieve himself of the necessity of spending money carrying her about the country while he had the others."

Defendant took the witness stand in his own behalf. On direct examination his testimony was limited to matters directly pertinent to the indictment. On cross-examination:

"Q. As a matter of fact that sickness [of a woman called Etta] was caused by blows from your hands, wasn't it?

"A. No.

"Q. Well, it was caused by blow or blows from your hands?

"A. No, no.

"Q. Was it not caused by blows received by Etta in Pekin Theater here in Chicago at your hands?

"A. No.

"Q. Did you not carry her out or have her carried out and put in the automobile and taken to the Washington Park Hospital after you had beaten her up?

"A. No, no.

* * * * * * *

"Q. Hattie was in the hospital while you were there, was she?

"A. Not that I know of.

"Q. Did you have any difficulty with her about putting her in a hospital?

"A. No.

"Q. Did you have any similar difficulty with Belle—fisticuff difficulty?

"A. What is that?

"Q. You had struck Belle on various occasions?

"A. Never in my life.

"Q. Do you remember using an automobile tool on her?

"A. Never in my life.

"Q. You never did that?

"A. Never.

"Q. You say you did not?

"A. I say no, emphatically no.

"Q. And bruised her side until it was black and blue?"

[7] A cross-examiner, for the purpose of showing the character of the party on the stand from his own admissions, may go into collateral matters, but he is bound by the answers he obtains. What becomes of the rule if the cross-examiner, after obtaining a direct answer, is permitted to persist in repeating insinuating questions with the obvious object of having his innuendoes taken in preference to the sworn answer? If this negro pugilist had admitted that he had "beaten up" white women he might well have been characterized as "a brute." The last four questions, and many of the others, were of the most pernicious type.

These matters might not of themselves lead to a reversal. They have been given to show the atmosphere of prejudice that pervades the record. They afford the setting in which must be viewed an erroneous admission of evidence. One witness was called on rebuttal. He was asked:

"Q. State the conversation you had on Christmas Eve, 1910, with defendant respecting Etta.

"A. He asked me to go to the hospital with him to call upon her. He told me he had had a fight with her at Bob Mott's Café on State street."

The giving of this testimony was duly objected to. We find nothing in the record to justify the injection into the case of the collateral question whether defendant exercised his fighting abilities upon women. When the situation thus improperly created is measured against the doubtfully sustainable prostitution counts, we are all convinced that defendant did not have a fair trial of that issue.

[6] It is urged that the assessment of punishment should be allowed to rest on the sexual intercourse counts. If one criminal act is charged in several ways, one good count, supported by competent evidence, will sustain a general verdict of guilty. If several criminal acts are charged, and if the sentences are made to run concurrently, the same rule applies. But here, as already pointed out, the elements involved in the two sets of counts are not identical. The trial judge in fact assessed the punishment on the basis that defendant was guilty of both offenses. The government loses nothing as to the one offense, when the conviction therefor is upheld and the trial judge is permitted to exercise his discretion anew.

The former judgment and mandate of this court should be re-entered; and it is so ordered.