## ROBINSON v. UNITED STATES.

Circuit Court of Appeals, Sixth Circuit.
January 15, 1929.

No. 4962.

was a member bank in the Federal Reserve system. Robinson was a customer of the bank. The two were indicted for violation of section 592, title 12, United States Code (12 USCA)—it being alleged that Beauchamp, as officer, misapplied the funds of the bank for the benefit of Robinson and with the intent to defraud and injure the bank, and that Robinson, with the same intent, aided and abetted Beauchamp therein. Beauchamp pleaded nolo contendere, and the trial proceeded as to Robinson. He was convicted upon each of the nine counts, and was sentenced to 4½ years in the penitentiary upon each count, his sentences to run concurrently, and also to pay a fine of $5,000 upon each count.[1] He assigns a large number of errors which do not need to be stated in detail.

[1, 2] Counts 6, 7, 8, and 9 form a related group, all referring to the same general transaction. In March, 1924, Robinson, a dealer in cotton, was indebted to the bank in very large amounts, for which it held his notes and commercial paper, secured by the deposit of warehouse receipts for many bales of cotton. Since the fall of 1923 it had been well understood, by the responsible officers of the bank as well as by Beauchamp, that Robinson was insolvent, that the security was inadequate, and that the bank would suffer a large loss on this Robinson account; but it had been decided to carry matters along and even aid Robinson by further advances in his buying and selling, in the belief that this course·was for the best interest of the bank. Giving ordinary interpretation to what was done in March, it would seem that the bank felt the necessity of reducing this account and that both Robinson and Beauchamp (giving them the benefit of the doubt) believed that Robinson could borrow at New Orleans banks $120,000, upon the faith of sufficient warehouse receipts for cotton to be security for that amount and reduce accordingly the Memphis bank debt. As a means of carrying this plan into effect, and in order to present to the New Orleans banks what would appear to be sales documents rather than merely Robinson's promissory note, he drew four drafts each for about $30,000, and each payable at 5 or 10 days' sight and drawn upon one Waddy in New Orleans. Each had attached thereto and noted thereon warehouse receipts for 200 bales of cotton (indicating a value of about $40,000), so that each pur-

Samuel O. Bates and John L. Exby, both of Memphis, Tenn., for plaintiff in error. Nugent Dodds, Sp. Asst. Atty. Gen. (Lindsay B. Phillips, U. S. Atty., of Memphis, Tenn., on the brief), for the United States.

Before DENISON, MACK, and MOORMAN, Circuit Judges.

DENISON, Circuit Judge. Beauchamp was vice president of a Memphis bank, which

---

[1] The language of the sentence is not free from ambiguity. It may mean that in lieu of separate fines upon each count, defendant is to pay one fine of $5,000; but the other is the more natural meaning, and the one accepted by all.

ported to be an ordinary bill of exchange drawn by a vendor upon a vendee in connection with the sale or proposed sale of cotton. In fact, Waddy was a clerk in Robinson's New Orleans office, no sale or shipment of cotton to him had been made or was in contemplation, and there was no expectation that these drafts would be presented to Waddy to be accepted and paid by him.

To make up the warehouse receipts for the 800 bales, Beauchamp attached to the drafts receipts for 300 bales, which were among the bank's collateral in the Robinson account, and also receipts for 500 bales which belonged to a correspondent bank and which the Memphis bank was holding as collateral for that bank (perhaps involving Robinson's paper which the Memphis bank had sold to the correspondent bank). Beauchamp then discounted these drafts, $120,000 was credited to Robinson's account, and the entire proceeds immediately disbursed to meet his checks. Whether these checks were already outstanding and would create an overdraft when they came in that day, or whether they must be given on that day to meet obligations then maturing, is not important; plainly the drafts were taken in and discounted by Beauchamp for the purpose of permitting Robinson to use the proceeds to meet his obligations; it does not appear that the proceeds were used for the benefit of the bank. Shortly thereafter, perhaps immediately, Beauchamp took certificates for 500 more bales which the bank already held in its collateral account for Robinson, and with them replaced the receipts which had been taken from the envelope of the correspondent bank. The drafts were sent on to New Orleans, the banks in that city refused to discount them, and they came back. The net result of the transaction was that, without getting any additional security, Robinson's indebtedness to the bank was increased by $120,000, and the paper which was discounted, though it purported to be commercial bills of exchange, was nothing but Robinson's one-name paper; and he was already indebted to the bank for much more than it expected ever to be able to collect from him.

The management of a bank, if knowing the facts, might decide that such an additional loan would be for the best interest of the bank as compared with some collapse, which would be the alternative; but when a subordinate officer, without the knowledge or approval of his superior officers or directors, makes such a loan, it is entirely clear that he thereby misapplies the funds of the bank. There is no substantial proof that Beauchamp had authority to make this loan in this way, or that Robinson supposed he had. Giving the fullest effect to any good-faith belief that the New Orleans banks would discount the drafts, even then Beauchamp was taking the collateral pledged to the bank on existing loans, and insufficient to satisfy them, and allowing Robinson to use this collateral to make new loans from some one else. What turned out to be a misapplication of the money of the bank, used in paying Robinson's checks, cannot be justified on the ground that the intent had been to misapply some of the other property of the bank.

The statute requires, not only that Beauchamp should have misapplied the funds of the bank, but that in so doing he should have intended to injure or defraud the bank. On this record the intent to defraud is as clear as the misapplication. By putting the transaction in a fictitious form, and thus, in effect, representing to the directors and to the bank that he was making this loan upon the security of pledged bales of cotton being then sold, when this was not true, he was deceiving the bank and necessarily defrauding it because of the deceit. When a bank officer misapplies the money of the bank, intends the misapplication, and for that purpose gets the money out of the bank by any kind of a false pretense, the inference of intent to injure or defraud, in the statutory sense, cannot be avoided. Galbreath v. U. S. (C. C. A. 6) 257 F. 648, 656. It would not be controlling if the new loan were perfectly good and collectible, the deceit and fraud would remain. One is guilty of using the mails to defraud if he endeavors to sell an article through any false representation, even though the article sold is worth all that the purchaser gives for it. U. S. v. New South Co., 241 U. S. 64, 71, 36 S. Ct. 505, 60 L. Ed. 890.

These recited facts appeared by Robinson's own testimony, and it follows that the verdict of guilty on the last four counts was so plainly the only verdict which the jury could rightly render that we may and should disregard the errors which are alleged as to procedure and evidence at the trial, and as to the rulings of the court in connection with charging the jury. Horning v. D. C., 254 U. S. 135, 41 S. Ct. 53, 65 L. Ed. 185.

The first four counts present another group and a different question. The evidence at least tends to show that, by the course of practice carried on for some time, when Robinson bought spot cotton, he would turn over the warehouse receipts to the bank, and the bank would furnish him additional funds,

if necessary, to pay for it. All this accumulating collateral was kept together, under the charge of a special clerk, and not attached to particular paper. When Robinson negotiated a sale of cotton he would—or at least sometimes did—draw upon the purchaser for the full amount to be sold, and designate by a note on the face of the draft what particular receipts in the possession of the bank he wished considered as devoted to this draft. Thereupon Beauchamp would discount this draft, and Robinson would take credit for it and use the proceeds. In the four instances here involved, Beauchamp understood that this cotton was not being shipped on these drafts, and therefore did not forward them for acceptance and collection, but retained them as if they evidenced merely loans to Robinson. For convenience, we designate this type as "fictitious." At the expiration of 90 days, Robinson would be charged interest upon them and would renew them, by another similar draft upon the same or some other apparent purchaser, but with full understanding by Beauchamp that these new drafts also were not what they seemed to be.

In the meantime, and as the periods arrived for partial deliveries to these same drawees, Robinson would make shipments of cotton, and suitable warehouse receipts to cover these actual shipments would be attached to a draft which Robinson would draw upon the purchaser, and this draft the bank would discount, forward for collection, and collect in the ordinary way. The result would be that when one of these fictitious drafts became 90 days old, the collateral designated thereon had perhaps already been released by the bank in other transactions in which it had received the value thereof; and then, upon the fictitious renewal drafts, other collateral out of that in the bank's possession would be minuted.

These first four counts relate to the type of transaction which has now been described. In September, 1923, four drafts of this fictitious character, which had been drawn by Robinson against persons to whom he had sold cotton, but not in connection with its actual shipment, and which the bank had discounted and had been carrying, matured; that is to say, the period of 90 days expired. Thereupon Robinson drew four new drafts of identical amounts, upon one Shaw, as if in connection with an actual sale. These were discounted for Robinson, and against the proceeds he drew checks to take up the old drafts.

Robinson undertook, as to these four counts, to make the defense that there had been no misapplication of the bank's funds by the discount of these Shaw drafts, because the whole transaction amounted to nothing except a renewal of Robinson's existing one-name paper; but the court emphatically ruled that there was no element of good defense in any such theory, refused to accept evidence tending to sustain that theory, and charged the jury that they should pay no attention to it. An exception was duly saved to the ruling on the evidence, and it was not necessary to repeat the exception as to the charge.

The statute, as already noted, specifies two elements as making up the offense. The first is that there shall be a willful misapplication of the moneys, funds, or credits of the bank; the second is that this shall be with the intent to injure or defraud the bank. As to these Shaw drafts, the second element may well be thought to appear without question. There is the intent to deceive the higher officials and directors of the bank as to the character of the paper which is being carried as a bank asset, and in this inheres the intent to defraud, even though no pecuniary injury to the bank is intended or does occur; but as to the first element, there is a different problem, and in such a situation as we assume the evidence tended to show, what item of "money, funds, or credits" has been willfully misapplied? The word "funds" is an inclusive one, and might include both money and credits if they were not specified; but considered separately the words have familiar meanings, and "credits" refers to obligations or debts of others to the bank.

In a case where one worthless piece of paper is substituted for another one, or where a noncollectible note is extended, either by direct extension or by accepting a renewal, it is not easy to see how there has been thereby any "application"—right or wrong—of any of the money, funds, or credits of the bank. Nor is it easy to understand how merely bookkeeping variations in the form of the transaction can make a crime out of what otherwise would not be. Whether a renewal note is merely entered on the bills receivable book in place of the old one, or instead is discounted and credited to the debtor, who thereupon makes his check applying this fund to paying the old note, is nothing but a matter of form; and, in the same way, there can be no substantial distinction, so far as concerns any application of the funds of the bank, between accepting a renewal note with attendant cancellation of the old and merely

agreeing to an extension of time upon the old note. In U. S. v. Britton, 107 U. S. 655, 666, 668, 2 S. Ct. 512, 27 L. Ed. 520, the Supreme Court defined the offense of this statute as involving a conversion of the bank's money, funds or credits for the personal benefit of the defendant or some one else. This definition has been often quoted and applied. The Circuit Court of Appeals of the Fourth Circuit, in a recent careful review of the question and the decisions bearing thereon, has concluded that such a substitution of paper as we have above assumed does not amount to an offense under this statute. Cooper v. U. S., 13 F. (2d) 16, 18.

Two reasons are urged why the doctrine of the Cooper Case should not be applied here. One is that an extension of credit, tying the hands of the bank for a definite period against action which might have been taken under the first matured paper, is the parting with a definite right which has at least theoretical value, although the extension might at any time be disavowed. Even if this right to sue could be considered as "money, funds, or credits," with the certainty required in the application of a criminal statute, there was here no such extension, on the face of the papers, or in fact. These drafts were, on their face, sight drafts and, in fact, demand notes.

The second point urged is that the old drafts were secured by collateral cotton of good quality, while the bales of cotton minuted on the new drafts were of inferior quality. It is, of course, to be conceded that if, on such a substitution of new paper for matured paper, valuable collateral is surrendered and a nonequivalent security substituted, the funds of the bank are misapplied; but the facts here make, at the most, only a question for the jury on this point. It seems to be possible, if not probable, that the certificates minuted upon the old drafts had all been in fact surrendered by the bank and the cotton shipped out and paid for to the bank before the so-called renewals in September. If that was the case, no loss of security followed in the acceptance of the renewals. Further, it should be noted that the primary question here involved is not a misapplication by Robinson but one by Beauchamp, and we find nothing to indicate that Beauchamp knew or had any reason to know that the bales of cotton noted on the renewals were not precisely the same kind of cotton as had been minuted on the former drafts.

We conclude, however, that we are not required to decide the full extent of the question discussed in the Cooper Case. There is testimony tending to show that the respon-

sible managers of the bank before this September fully understood that Robinson was insolvent and that they had deliberately entered upon the policy of co-operating with him in carrying him, extending his indebtedness and even making him new loans, all with the purpose of minimizing their inevitable loss. Beauchamp knew this policy and was authorized, at least to some extent, to carry it out. In such a situation, we think it cannot be said, as a matter of law, that Beauchamp's action in extending time to Robinson by accepting new paper of the same character and value as that which had matured, was a willful misapplication of the funds or credits of the bank. On the contrary, this aspect of the case presented several questions which at least entitled defendant to go to the jury.

It is true that when the court makes a ruling which is right in a broad or general way, but which counsel thinks not applicable to the case for some special reason, it may often be the duty of counsel to present to the court the precise distinction on which they depend; but after the court has ruled, as here, that a certain theory of defense is and will be utterly rejected—lock, stock and barrel—counsel are under no obligation to go further. We must conclude, therefore, that there was reversible error as to counts 1, 2, 3, and 4.

With some hesitation we put count 5 in the same class with the first four. The draft was not a renewal, but its proceeds may have been used so far for the benefit of the bank that the jury would not be compelled to find there was misapplication. If the case stood alone on this count, it would require more careful consideration; but in view of the practical situation, and the sentence imposed, we deem it appropriate that the reversal extend to this count also.

Thus we develop a single trial upon nine counts, with a single verdict of guilty, and a finding of no error as to four counts, and reversible error as to five. Under the circumstances of this case, the imprisonment sentence upon the four counts having been deemed by the trial judge to be appropriate punishment also for the five, we are not clear that the sentence as to the four ought to stand and at the same time a new trial be had as to the five. See Blitz v. U. S., 153 U. S. 308, 318, 14 S. Ct. 924, 38 L. Ed. 725; Ballew v. U. S., 160 U. S. 187, 203, 16 S. Ct. 263, 40 L. Ed. 388; Putnam v. U. S., 162 U. S. 687, 714, 16 S. Ct. 923, 40 L. Ed. 1118; Johnson v. U. S. (C. C. A. 7), 215 F. 679, 684, 687, L. R. A. 1915A, 862. The intimation to the contrary in De Jianne v. U. S. (C. C. A. 3)

282 F. 737, 742, does not seem to be supported by the cases therein cited.

The convictions and sentences upon the first five counts are reversed, the convictions upon the last four counts are affirmed, but the sentences thereon are reversed; and the case is remanded for further proceedings. Upon such remand the court below may proceed forthwith to impose appropriate sentence upon the four convictions so affirmed, reimposing the same sentence as before or some different sentence as his discretion may dictate; or he may delay sentence upon such four counts until the termination of the remainder of the case, either by trial upon the other five counts or by government's dismissal of the same, if it should elect so to do, and then impose the sentence which then seems appropriate upon the entire case.